# EXHIBIT A

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**Independent Review Panel**

**CASE #50 2013 001083**

---

### FINAL DECLARATION

---

**In the matter of an Independent Review Process (IRP) pursuant to the
Internet Corporation For Assigned Names and Number's (ICANN's) Bylaws,
the *International Dispute Resolution Procedures* (ICDR Rules) and the
*Supplementary Procedures for ICANN Independent Review Process* of the
International Centre for Dispute Resolution (ICDR),**

**Between:**   **DotConnectAfrica Trust**;
("Claimant" or "DCA Trust")

Represented by Mr. Arif H. Ali, Ms. Meredith Craven, Ms. Erin Yates
and Mr. Ricardo Ampudia of Weil, Gotshal & Manges, LLP located at
1300 Eye Street, NW, Suite 900, Washington, DC 2005, U.S.A.

**And**

**Internet Corporation for Assigned Names and Numbers (ICANN)**;
("Respondent" or "ICANN")

Represented by Mr. Jeffrey A. LeVee and Ms. Rachel Zernik of Jones
Day, LLP located at 555 South Flower Street, Fiftieth Floor, Los
Angeles, CA 90071, U.S.A.

Claimant and Respondent will together be referred to as "Parties".

### IRP Panel

**Prof. Catherine Kessedjian**
**Hon. William J. Cahill (Ret.)**
**Babak Barin, *President***

1

## I.     BACKGROUND

1.     DCA Trust is non-profit organization established under the laws of the Republic of Mauritius on 15 July 2010 with its registry operation – DCA Registry Services (Kenya) Limited – as its principal place of business in Nairobi, Kenya.

2.     DCA Trust was formed with the charitable purpose of, among other things, advancing information technology education in Africa and providing a continental Internet domain name to provide access to internet services for the people of Africa and not for the public good.

3.     In March 2012, DCA Trust applied to ICANN for the delegation of the .AFRICA top-level domain name in its 2012 General Top-Level Domains ("gTLD") Internet Expansion Program (the "New gTLD Program"), an internet resource available for delegation under that program.

4.     ICANN is a non-profit corporation established on 30 September 1998 under the laws of the State of California, and headquartered in Marina del Rey, California, U.S.A. According to its Articles of Incorporation, ICANN was established for the benefit of the Internet community as a whole and is tasked with carrying out its activities in conformity with relevant principles of international law, international conventions and local law.

5.     On 4 June 2013, the ICANN Board New gTLD Program Committee ("NGPC") posted a notice that it had decided not to accept DCA Trust's application.

6.     On 19 June 2013, DCA Trust filed a request for reconsideration by the ICANN Board Governance Committee ("BGC"), which denied the request on 1 August 2013.

7.     On 19 August 2013, DCA Trust informed ICANN of its intention to seek relief before an Independent Review Panel under ICANN's Bylaws. Between August and October 2013, DCA Trust and ICANN participated in a Cooperative Engagement Process ("CEP") to try and resolve the issues relating to DCA Trust's application. Despite several meetings, no resolution was reached.

8.     On 24 October 2013, DCA Trust filed a Notice of Independent Review Process with the ICDR in accordance with Article IV, Section 3 of ICANN's Bylaws.

2

9.  In an effort to safeguard its rights pending the ongoing constitution of the IRP Panel, on 22 January 2014, DCA Trust wrote to ICANN requesting that it immediately cease any further processing of all applications for the delegation of the .AFRICA gTLD, failing which DCA Trust would seek emergency relief under Article 37 of the ICDR Rules.

10. DCA Trust also indicated that it believed it had the right to seek such relief because there was no standing panel as anticipated in the Supplementary Procedures for ICANN Independent Review Process ("Supplementary Procedures"), which could otherwise hear requests for emergency relief.

11. In response, on 5 February 2014, ICANN wrote:

> Although ICANN typically is refraining from further processing activities in conjunction with pending gTLD applications where a competing applicant has a pending reconsideration request, ICANN does not intend to refrain from further processing of applications that relate in some way to pending independent review proceedings. In this particular instance, ICANN believes that the grounds for DCA's IRP are exceedingly weak, and that the decision to refrain from the further processing of other applications on the basis of the pending IRP would be unfair to others.

12. In its Request for Emergency Arbitrator and Interim Measures of Protection subsequently submitted on 28 March 2014, DCA Trust pleaded, *inter alia*, that, in an effort to preserve its rights, in January 2014, DCA requested that ICANN suspend its processing of applications for .AFRICA during the pendency of this proceeding. ICANN, however, summarily refused to do so.

13. DCA Trust also submitted that "on 23 March 2014, DCA became aware that ICANN intended to sign an agreement with DCA's competitor (a South African company called ZACR) on 26 March 2014 in Beijing […] Immediately upon receiving this information, DCA contacted ICANN and asked it to refrain from signing the agreement with ZACR in light of the fact that this proceeding was still pending. Instead, according to ICANN's website, ICANN *signed its agreement with ZACR the very next day, two days ahead of plan, on 24 March instead of 26 March*."

14. According to DCA Trust, that same day, "ICANN then responded to DCA's request by presenting the execution of the contract as a *fait accompli*, arguing that DCA should have sought to stop ICANN from proceeding with ZACR's application, as ICANN had already informed DCA of its intention [to] ignore its obligations to participate in this proceeding in good faith."

3

15. DCA Trust also submitted that on 25 March 2014, as per ICANN's email to the ICDR, "ICANN for the first time informed DCA that it would accept the application of Article 37 of the ICDR Rules to this proceeding contrary to the express provisions of the Supplementary Procedures of ICANN has put in place for the IRP Process."

16. In its Request, DCA Trust argued that it "is entitled to an accountability proceeding with legitimacy and integrity, with the capacity to provide a meaningful remedy. [...] DCA has requested the opportunity to compete for rights to .AFRICA pursuant to the rules that ICANN put into place. Allowing ICANN to delegate .AFRICA to DCA's only competitor – which took actions that were instrumental in the process leading to ICANN's decision to reject DCA's application – would eviscerate the very purpose of this proceeding and deprive DCA of its rights under ICANN's own constitutive instruments and international law."

17. Finally, among other things, DCA Trust requested the following interim relief:

> a. An order compelling *ICANN to refrain from any further steps toward delegation of the .AFRICA gTLD,* including but not limited to execution or assessment of pre-delegation testing, negotiations or discussions relating to delegation with the entity ZACR or any of its officers or agents; [...]

18. On 24 April and 12 May 2014, the Panel issued Procedural Order No. 1, a Decision on Interim Measures of Protection, and a list of questions for the Parties to answer.

19. In its 12 May 2014 Decision on Interim Measures of Protection, the Panel required ICANN to "immediately refrain from any further processing of any application for .AFRICA until [the Panel] heard the merits of DCA Trust's Notice of Independent Review Process and issued its conclusions regarding the same".

20. In the Panel's unanimous view, among other reasons, it would have been "unfair and unjust to deny DCA Trust's request for interim relief when the need for such a relief...[arose] out of ICANN's failure to follow its own Bylaws and procedures." The Panel also reserved its decision on the issue of costs relating to that stage of the proceeding until the hearing of the merits.

21. On 27 May and 4 June 2015, the Panel issued Procedural Order No. 2 and a Decision on ICANN's request for Partial Reconsideration of certain portions of its Decision on Interim Measures of Protection.

4

22.  In its 4 June 2014 Decision on ICANN's request for Partial Reconsideration, the Panel unanimously concluded that ICANN's request must be denied. In that Decision, the Panel observed:

> 9. After careful consideration of the Parties' respective submissions, the Panel is of the unanimous view that ICANN's Request must be denied for two reasons.
>
> 10. First, there is nothing in ICANN's Bylaws, the International Dispute Resolution Procedures of the ICDR effective as at 1 June 2009 or the Supplementary Procedures for ICANN Independent Review Process that in any way address the Panel's ability to address ICANN's Request. The Panel has not been able to find any relevant guidance in this regard in any of the above instruments and ICANN has not pointed to any relevant provision or rule that would support its argument that the Panel has the authority to reconsider its Decision of 12 May 2014.
>
> 11.Moreover, ICANN has not pointed to any clerical, typographical or computation error or shortcoming in the Panel's Decision and it has not requested an interpretation of the Panel's Decision based on any ambiguity or vagueness. To the contrary, ICANN has asked the Panel to reconsider its prior findings with respect to certain references in its Decision that ICANN disagrees with, on the basis that those references are in ICANN's view, inaccurate.
>
> 12. Second, even if the Panel were to reconsider based on any provision or rule available, its findings with respect to those passages complained of by ICANN as being inaccurate in its Decision – namely paragraphs 29 to 33 – after deliberation, the Panel would still conclude that ICANN has failed to follow its own Bylaws as more specifically explained in the above paragraphs, in the context of addressing which of the Parties should be viewed as responsible for the delays associated with DCA Trust's Request for Interim Measures of Protection. It is not reasonable to construe the By-law proviso for consideration by a provider-appointed *ad hoc* panel when a standing panel is not in place as relieving ICANN indefinitely of forming the required standing panel.  Instead, the provider appointed panel is properly viewed as an interim procedure to be used before ICANN has a chance to form a standing panel.  Here, more than a year has elapsed, and ICANN has offered no explanation why the standing panel has not been formed, nor indeed any indication that formation of that panel is in process, or has begun, or indeed even is planned to begin at some point.

The Panel also reserved its decision on the issue of costs relating to that stage of the proceeding until the hearing of the merits.

23. On 14 August 2014, the Panel issued a Declaration on the IRP Procedure ("2014 Declaration") pursuant to which it (1) ordered a reasonable documentary exchange, (2) permitted the Parties to benefit from additional filings and supplementary briefing, (3) allowed a video hearing, and (4) permitted both Parties at the hearing to

challenge and test the veracity of any written statements made by witnesses.

The Panel also concluded that its Declaration on the IRP and its future Declaration on the Merits of the case were binding on the Parties. In particular, the Panel decided:

98. Various provisions of ICANN's Bylaws and the Supplementary Procedures support the conclusion that the Panel's decisions, opinions and declarations are binding. There is certainly nothing in the Supplementary Rules that renders the decisions, opinions and declarations of the Panel either advisory or non-binding.

[…]

100. Section 10 of the Supplementary Procedures resembles Article 27 of the ICDR Rules. Whereas Article 27 refers to "Awards", section 10 refers to "Declarations". Section 10 of the Supplementary Procedures, however, is silent on whether Declarations made by the IRP Panel are "final and binding" on the parties.

101. As explained earlier, as per Article IV, Section 3, paragraph 8 of the Bylaws, the Board of Directors of ICANN has given its approval to the ICDR to establish a set of operating rules and procedures for the conduct of the IRP set out in section 3. The operating rules and procedures established by the ICDR are the ICDR Rules as referred to in the preamble of the Supplementary Procedures. These Rules have been <u>supplemented</u> with the Supplementary Procedures.

102. This is clear from two different parts of the Supplementary Procedures. First, in the preamble, where the Supplementary Procedures state that: "These procedures supplement the International Centre for Dispute Resolution's International Arbitration Rules in accordance with the independent review procedures set forth in Article IV, Section 3 of the ICANN Bylaws".

103. And second, under section 2 entitled (Scope), that states that the "ICDR will apply these Supplementary Procedures, <u>in addition</u> to the INTERNATIONAL DISPUTE RESOLUTION PROCEDURES, in all cases submitted to the ICDR in connection with the Article IV, Section 3(4) of the ICANN Bylaws". It is therefore clear that ICANN intended the operating rules and procedures for the independent review to be an international set of arbitration rules supplemented by a particular set of additional rules.

104. There is also nothing inconsistent between section 10 of the Supplementary Procedures and Article 27 of the ICDR Rules.

105. One of the hallmarks of international arbitration is the binding and final nature of the decisions made by the adjudicators. Binding arbitration is the essence of what the ICDR Rules, the ICDR itself and its parent, the American Arbitration Association, offer. The selection of the ICDR Rules as the baseline set of procedures for IRP's, therefore, points to a binding adjudicative process.

6

106. Furthermore, the process adopted in the Supplementary Procedures is an adversarial one where counsel for the parties present competing evidence and arguments, and a panel decides who prevails, when and in what circumstances. The panellists who adjudicate the parties' claims are also selected from among experienced arbitrators, whose usual charter is to make binding decisions.

107. The above is further supported by the language and spirit of section 11 of ICANN's Bylaws. Pursuant to that section, the IRP Panel has the authority to summarily dismiss requests brought without standing, lacking in substance, or that are frivolous or vexatious. Surely, such a decision, opinion or declaration on the part of the Panel would not be considered advisory.

[…]

110. ICANN points to the extensive public and expert input that preceded the formulation of the Supplementary Procedures. The Panel would have expected, were a mere advisory decision, opinion or declaration the objective of the IRP, that this intent be clearly articulated somewhere in the Bylaws or the Supplementary Procedures. In the Panel's view, this could have easily been done.

111. The force of the foregoing textual and construction considerations as pointing to the binding effect of the Panel's decisions and declarations are reinforced by two factors: 1) the exclusive nature of the IRP whereby the non-binding argument would be clearly in contradiction with such a factor; and, 2) the special, unique, and publicly important function of ICANN. As explained before, ICANN is not an ordinary private non-profit entity deciding for its own sake who it wishes to conduct business with, and who it does not.  ICANN rather, is the steward of a highly valuable and important international resource.

[…]

115. Moreover, assuming for the sake of argument that it is acceptable for ICANN to adopt a remedial scheme with no teeth, the Panel is of the opinion that, at a minimum, the IRP should forthrightly explain and acknowledge that the process is merely advisory. This would at least let parties know before embarking on a potentially expensive process that a victory before the IRP panel may be ignored by ICANN. And, a straightforward acknowledgment that the IRP process is intended to be merely advisory might lead to a legislative or executive initiative to create a truly independent compulsory process. The Panel seriously doubts that the Senators questioning former ICANN President Stuart Lynn in 2002 would have been satisfied had they understood that a) ICANN had imposed on all applicants a waiver of all judicial remedies, *and* b) the IRP process touted by ICANN as the "ultimate guarantor" of ICANN accountability was only an advisory process, the benefit of which accrued only to ICANN. [Underlining is from the original decision.]

The Panel also reserved its decision on the issue of costs relating to that stage of the proceeding until the hearing of the merits.

7

24. On 5 September and 25 September 2014, the Panel issued Procedural Orders No. 3 and No. 4. In Procedural Order No. 3, the Panel notably required the Parties to complete their respective filing of briefs in accordance with the IRP Procedure Guidelines by 3 November 2014 for DCA Trust and 3 December 2014 for ICANN.

25. In Procedural Order No. 4 dated 25 September 2014, the Panel reached a decision regarding document production issues.

26. On 3 November 2014 and 3 December 2014, the Parties filed their Memorial and Response Memorial on the Merits in accordance with the timetable set out in Procedural Order No. 3.

27. On 26 February 2015, following the passing away of the Hon. Richard C. Neal (Ret.) and confirmation by the ICDR of his replacement arbitrator, the Hon. William J. Cahill (Ret.), ICANN requested that this Panel consider revisiting the part of this IRP relating to the issue of hearing witnesses addressed in the Panel's 2014 Declaration.

28. In particular, ICANN submitted that given the replacement of Justice Neal, Article 15.2 of the ICDR Rules together with the Supplementary Procedures permitted this IRP to in its sole discretion, determine "whether all or part" of this IRP should be repeated.

29. According to ICANN, while it was not necessary to repeat all of this IRP, since the Panel here had exceeded its authority under the Supplementary Procedures when it held in its 2014 Declaration that it could order live testimony of witnesses, the Panel should then at a minimum consider revisiting that issue.

30. According to ICANN, panelists derived "their powers and authority from the relevant applicable rules, the parties' requests, and the contractual provisions agreed to by the Parties (in this instance, ICANN's Bylaws, which establish the process of independent review). The authority of panelists is limited by such rules, submissions and agreements."

31. ICANN emphasized that "compliance with the Supplementary Procedures [was] critical to ensure predictability for ICANN, applicants for and objectors to gTLD applications, and the entire ICANN community…", and while "ICANN [was] committed to fairness and accessibility…ICANN [was] also committed to predictability and the like treatment of all applicants. For this Panel to change the rules

8

for this single applicant [did] not encourage any of these commitments."

32. ICANN also pleaded that, DCA specifically agreed to be bound by the Supplementary Procedures when it initially submitted its application, the Supplementary Procedures apply to both ICANN and DCA alike, ICANN is now in the same position when it comes to testing witness declarations and finally, in alternative dispute resolution proceedings where cross examination of witnesses is allowed, parties often waive cross-examination.

33. Finally, ICANN advanced that:

> [T]he Independent Review process is an alternative dispute resolution procedure adapted to the specific issues to be addressed pursuant to ICANN's Bylaws. The process cannot be transformed into a full-fledged trial without amending ICANN's Bylaws and the Supplementary Procedures, which specifically provide for a hearing that includes counsel argument only. Accordingly, ICANN strongly urges the Panel to follow the rules for this proceeding and to declare that the hearing in May will be limited to argument of counsel.

34. On 24 March 2015, the Panel issued its Declaration on ICANN's Request for Revisiting of the 14 August Declaration on the IRP Procedure following the Replacement of Panel Member. In that Declaration, the newly constituted Panel unanimously concluded that it was not necessary for it to reconsider or revisit its 2014 Declaration.

35. In passing and not at all as a result of any intended or inadvertent reconsideration or revisiting of its 2014 Declaration, the Panel referred to Articles III and IV of ICANN's Bylaws and concluded:

> Under the general heading, Transparency, and title "Purpose", Section 1 of Article III states: "ICANN and its constituent bodies shall operate to the maximum extent feasible in an open and transparent manner and consistent with procedures designed to ensure fairness." Under the general heading, Accountability and Review, and title "Purpose", Section 1 of Article IV reads: "In carrying out its mission as set out in these Bylaws, ICANN should be accountable to the community for operating in a manner that is consistent with these Bylaws, and with due regard for the core values set forth in Article I of these Bylaws." In light of the above, and again in passing only, it is the Panel's unanimous view, that the filing of fact witness statements (as ICANN has done in this IRP) and limiting telephonic or in-person hearings to argument only is inconsistent with the objectives setout in Articles III and IV setout above.

The Panel again reserved its decision on the issue of costs relating to that stage of the proceeding until the hearing of the merits.

9

36. On 24 March and 1 April 2015, the Panel rendered Procedural Orders No. 5 and 6, in which, among other things, the Panel recorded the Parties' "agreement that there will no cross-examination of any of the witnesses" at the hearing of the merits.

37. On 20 April 2015, the Panel rendered its Third Declaration on the IRP Procedure. In that Declaration, the Panel decided that the hearing of this IRP should be an in-person one in Washington, D.C. and required all three witnesses who had filed witness statements to be present at the hearing.

38. The Panel in particular noted that:

> 13. […] Article IV, Section 3, and Paragraph 4 of ICANN's Bylaws (reproduced above) – the Independent Review Process – was designed and set up to offer the Internet community, an accountability process that would ensure that ICANN acted in a manner consistent with ICANN's Articles of Incorporation and Bylaws.
>
> 14. Both ICANN's Bylaws and the Supplementary Rules require an IRP Panel to *examine* and *decide* whether the Board has acted consistently with the provisions of the Articles of Incorporation and Bylaws. As ICANN's Bylaws explicitly put it, an IRP Panel is "*charged with* comparing contested actions of the Board […], and with *declaring* whether the Board has acted consistently with the provisions of the Articles of Incorporation and Bylaws.
>
> 15. The IRP is the only independent third party process that allows review of board actions to ensure their consistency with the Articles of Incorporation or Bylaws. As already explained in this Panel's 14 August 2014 Declaration on the IRP Procedure ("August 2014 Declaration"), the avenues of accountability for applicants that have disputes with ICANN do *not* include resort to the courts. Applications for gTLD delegations are governed by ICANN's Guidebook, which provides that applicants waive all right to resort to the courts:
>
>> "Applicant hereby releases ICANN […] from any and all claims that arise out of, are based upon, or are in any way related to, any action or failure to act by ICANN […] in connection with ICANN's review of this application, investigation, or verification, any characterization or description of applicant or the information in this application, any withdrawal of this application or the decision by ICANN to recommend or not to recommend, the approval of applicant's gTLD application.  APPLICANT AGREES NOT TO CHALLENGE, IN COURT OR ANY OTHER JUDICIAL FORA, ANY FINAL DECISION MADE BY ICANN WITH RESPECT TO THE APPLICATION, AND IRREVOCABLY WAIVES ANY RIGHT TO SUE OR PROCEED IN COURT OR ANY OTHER JUDICIAL FORA ON THE BASIS OF ANY OTHER LEGAL CLAIM AGAINST ICANN ON THE BASIS OF ANY OTHER LEGAL CLAIM."
>
> Thus, assuming that the foregoing waiver of any and all judicial remedies is valid and enforceable, then the only and ultimate "accountability" remedy for an applicant is the IRP.
>
> 16. Accountability requires an organization to explain or give reasons for its activities, accept responsibility for them and to disclose the results in a transparent manner.

[...]

21. In order to keep the costs and burdens of independent review as low as possible, ICANN's Bylaws, in Article IV, Section 3 and Paragraph 12, suggests that the IRP Panel conduct its proceedings by email and otherwise via the Internet to the maximum extent feasible, and where necessary the IRP Panel may hold meetings by telephone. Use of the words "should" and "may" versus "shall" are demonstrative of this point. In the same paragraph, however, ICANN's Bylaws state that, "in the unlikely event that a telephonic or in-person hearing is convened, the hearing *shall* be limited to argument only; all evidence, including witness statements, must be submitted in writing in advance."

22. The Panel finds that this last sentence in Paragraph 12 of ICANN's Bylaws, unduly and improperly restricts the Panel's ability to conduct the "independent review" it has been explicitly mandated to carryout in Paragraph 4 of Section 3 in the manner it considers appropriate.

23. How can a Panel compare contested actions of the Board and declare whether or not they are consistent with the provisions of the Articles of Incorporation and Bylaws, without the ability to fact find and make enquiries concerning those actions in the manner it considers appropriate?

24. How can the Panel for example, determine, if the Board acted without conflict of interest, exercised due diligence and care in having a reasonable amount of facts in front of it, or exercised independent judgment in taking decisions, if the Panel cannot ask the questions it needs to, in the manner it needs to or considers fair, just and appropriate in the circumstances?

25. How can the Panel ensure that the parties to this IRP are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case with respect to the mandate the Panel has been given, if as ICANN submits, "ICANN's Bylaws do not permit any examination of witnesses by the parties or the Panel during the hearing"?

26. The Panel is unanimously of the view that it cannot. The Panel is also of the view that any attempt by ICANN in this case to prevent it from carrying out its independent review of ICANN Board's actions in the manner that the Panel considers appropriate under the circumstances deprives the accountability and review process set out in the Bylaws of any meaning.

27. ICANN has filed two 'Declarations' in this IRP, one signed by Ms. Heather Dryden, a Senior Policy Advisor at the International Telecommunications Policy and Coordination Directorate at Industry Canada, and Chair of ICANN Government Advisory Committee from 2010 to 2013, and the other by Mr. Cherine Chalaby, a member of the Board of Directors of ICANN since 2010. Mr. Chalaby is also, since its inception, one of three members of the Subcommittee on Ethics and Conflicts of ICANN's Board of Governance Committee.

28. In their respective statements, both individuals have confirmed that they "have personal knowledge of the matters set forth in [their] declaration and [are] competent to testify to these matters *if called as a witness.*"

11

[…]

29. In his Declaration, Mr. Chalaby states that "all members of the NGPC were asked to and did specifically affirm that they did not have a conflict of interest related to DCA's application for .AFRICA when they voted on the GAC advice. In addition, the NGPC asked the BGC to look into the issue further, and the BGC referred the matter to the Subcommittee. After investigating the matter, the Subcommittee concluded that Chris Disspain and Mike Silber did not have conflicts of interest with respect to DCA's application for .AFRICA."

30. The Panel considers it important and useful for ICANN's witnesses, and in particular, Mr. Chalaby as well as for Ms. Sophia Bekele Eshete to be present at the hearing of this IRP.

31. While the Panel takes note of ICANN's position depicted on page 2 of its 8 April 2015 letter, the Panel nonetheless invites ICANN to reconsider its position.

32. The Panel also takes note of ICANN's offer in that same letter to address written questions to its witnesses before the hearing, and if the Panel needs more information after the hearing to clarify the evidence presented during the hearing. The Panel, however, is unanimously of the view that this approach is fundamentally inconsistent with the requirements in ICANN's Bylaws for it to act openly, transparently, fairly and with integrity.

33. As already indicated in this Panel's August 2014 Declaration, analysis of the propriety of ICANN's decisions in this case will depend at least in part on evidence about the intentions and conduct of ICANN's top personnel. Even though the Parties have explicitly agreed that neither will have an opportunity to cross-examine the witnesses of the other in this IRP, the Panel is of the view that ICANN should not be allowed to rely on written statements of its top officers attesting to the propriety of their actions and decisions without an opportunity for the Panel and thereafter DCA Trust's counsel to ask any follow-up questions arising out of the Panel's questions of ICANN's witnesses. The same opportunity of course will be given to ICANN to ask questions of Ms. Bekele Eshete, after the Panel has directed its questions to her.

34. The Parties having agreed that there will be no cross-examination of witnesses in this IRP, the procedure for asking witnesses questions at the hearing shall be as follows:

    a)    The Panel shall first have an opportunity to ask any witness any questions it deems necessary or appropriate;

    b)    Each Party thereafter, shall have an opportunity to ask any follow-up questions the Panel permits them to ask of any witness.

The Panel again reserved its decision on the issue of costs relating to that stage of the proceeding until the hearing of the merits.

39. On 27 April and 4 May 2015, the Panel issued its Procedural Order No. 7 and 8, and on that last date, it held a prehearing conference call with the Parties as required by the ICDR Rules. In Procedural

Order No. 8, the Panel set out the order of witness and party presentations agreed upon by the Parties.

40. On 18 May 2015, and in response to ZA Central Registry's (ZACR) request to have two of its representatives along with a representative from the African Union Commission (AUC) attend at the IRP hearing scheduled for 22 and 23 May 2015 in Washington, D.C., the Panel issued its Procedural Order No. 9, denying the requests made by ZACR and AUC to be at the merits hearing of this matter in Washington, D.C.

41. In a letter dated 11 May 2015, ZACR and AUC's legal representative had submitted that both entities had an interest in this matter and it would be mutually beneficial for the IRP to permit them to attend at the hearing in Washington, D.C.

42. ZACR's legal representative had also argued that "allowing for interests of a materially affected party such as ZACR, the successful applicant for the dotAfrica gTLD, as well as broader public interests, to be present enhances the legitimacy of the proceedings and therefore the accountability and transparency of ICANN and its dispute resolution procedures."

43. For the Panel, Article 20 of the ICDR Rules, which applied in this matter, stated that the hearing of this IRP was "private unless the parties agree otherwise". The Parties in this IRP did not consent to the presence of ZACR and AUC. While ICANN indicated that it had no objection to the presence of ZACR and AUC, DCA Trust was not of the same view. Therefore, ZACR and AUC were not permitted to attend.

44. The in-person hearing of the merits of this IRP took place on 22 and 23 May 2015 at the offices of Jones Day LLP in Washington, D.C. All three individuals who had filed witness statements in this IRP, namely Ms. Sophia Bekele Eshete, representative for DCA Trust, Ms. Heather Dryden and Mr. Cherine Chalaby, representatives for ICANN, attended in person and answered questions put to them by the Panel and subsequently by the legal representatives of both Parties. In attendance at the hearing was also Ms. Amy Stathos, Deputy General Counsel of ICANN.

45. The proceedings of the hearing were reported by Ms. Cindy L. Sebo of TransPerfect Legal Solutions, who is a Registered Merit Real-Time Court Reporter.

13

46. On the last day of the hearing, DCA Trust was asked by the Panel to clearly and explicitly articulate its prayers for relief. In a document entitled Claimant's Final Request for Relief which was signed by the Executive Director of DCA Trust, Ms. Sophia Bekele and marked at the hearing as Hearing Exhibit 4, DCA Trust asked the Panel to:

Declare that the Board violated ICANN's Articles of Incorporation, Bylaws and the Applicant Guidebook (AGB) by:

- Discriminating against DCA and wrongfully assisting the AUC and ZACR to obtain rights to the .AFRICA gTLD;
- Failing to apply ICANN's procedures in a neutral and objective manner, with procedural fairness when it accepted the GAC Objection Advice against DCA; and
- Failing to apply its procedures in a neutral and objective manner, with procedural fairness when it approved the BGC's recommendation not to reconsider the NGPC's acceptance of the GAC Objection Advice against DCA;

And to declare that:

- DCA is the prevailing party in this IRP and, consequently, shall be entitled to its costs in this proceeding; and
- DCA is entitled to such other relief as the Panel may find appropriate under the circumstances described herein.

Recommend, as a result of each of these violations, that:

- ICANN cease all preparations to delegate the .AFRICA gTLD to ZACR;
- ICANN permit DCA's application to proceed through the remainder of the new gTLD application process and be granted a period of no less than 18 months to obtain Government support as set out in the AGB and interpreted by the Geographic Names Panel, or accept that the requirement is satisfied as a result of the endorsement of DCA Trust's application by UNECA; and
- ICANN compensate DCA for the costs it has incurred as a result of ICANN's violations of its Articles of Incorporation, Bylaws and AGB.

47. In its response to DCA Trust's Final Request for Relief, ICANN submitted that, "the Panel should find that no action (or inaction) of the ICANN Board was inconsistent with the Articles of Incorporation or Bylaws, and accordingly none of DCA's requested relief is appropriate."

48. ICANN also submitted that:

DCA urges that the Panel issue a declaration in its favor…and also asks that the Panel declare that DCA is the prevailing party and entitled to its costs. Although ICANN believes that the evidence does not support the

14

declarations that DCA seeks, ICANN does not object to the form of DCA's requests.

At the bottom of DCA's Final Request for Relief, DCA asks that the Panel recommend that ICANN cease all preparations to delegate the .AFRICA gTLD to ZACR, and that ICANN permit DCA's application to proceed and give DCA no less than 18 additional months from the date of the Panel's declaration to attempt to obtain the requisite support of the countries in Africa. ICANN objects to that appropriateness of these requested recommendations because they are well outside the Panel's authority as set forth in the Bylaws.

[…]

Because the Panel's authority is limited to declaring whether the Board's conduct was inconsistent with the Articles or the Bylaws, the Panel should limit its declaration to that question and refrain from recommending how the Board should then proceed in light of the Panel's declaration. Pursuant to Paragraph 12 of that same section of the Bylaws, the Board will consider the Panel's declaration at its next meeting, and if the Panel has declared that the Board's conduct was inconsistent with the Articles or the Bylaws, the Board will have to determine how to act upon the opinion of the Panel.

By way of example only, if the Panel somehow found that the unanimous NGPC vote on 4 June 2013 was not properly taken, the Board might determine that the vote from that meeting should be set aside and that the NGPC should consider the issue anew. Likewise, if the Panel were to determine that the NGPC did not adequately consider the GAC advice at [the] 4 June 2013 meeting, the Board might require that the NGPC reconsider the GAC advice.

In all events, the Bylaws mandate that the Board has the responsibility of fashioning the appropriate remedy once the Panel has declared whether or not it thinks the Board's conduct was inconsistent with ICANN's Articles of Incorporation and Bylaws. The Bylaws do not provide the Panel with the authority to make any recommendations or declarations in this respect.

49. In response to ICANN's submissions above, on 15 June 2015, DCA Trust advanced that the Panel had already ruled that its declaration on the merits will be binding on the Parties and that nothing in ICANN's Bylaws, the Supplementary Procedures or the ICDR Rules applicable in these proceedings prohibits the Panel from making a recommendation to the ICANN Board of Directors regarding an appropriate remedy. DCA Trust also submitted that:

According to ICANN's Bylaws, the Independent Review Process is designed to provide a remedy for "any" person materially affected by a decision or action by the Board. Further, "in order to be materially affected, the person must suffer injury or harm that is directly and causally connected to the Board's alleged violation of the Bylaws or the Articles of Incorporation. Indeed, the ICANN New gTLD Program Committee, operating under the delegated authority of the ICANN Board, itself suggested that DCA could seek relief through ICANN's accountability

> mechanisms or, in other words, the Reconsideration process and the Independent Review Process. If the IRP mechanism – the mechanism of last resort for gTLD applicants – is intended to provide a remedy for a claimant materially injured or harmed by Board action or inaction, and it serves as the only alternative to litigation, then naturally the IRP Panel may recommend how the ICANN Board might fashion a remedy to redress such injury or harm.

50. On 25 June 2015, the Panel issued its Procedural Order No. 10, directing the Parties to by 1 July 2015 simultaneously file their detailed submissions on costs and their allocation in these proceedings.

51. The additional factual background and reasons in the above decisions, procedural orders and declarations rendered by the Panel are hereby adopted and incorporated by reference in this Final Declaration.

52. On 1 and 2 July 2015, the Parties filed their respective positions and submissions on costs.

## II.   BRIEF SUMMARY OF THE PARTIES' POSITIONS ON THE MERITS & REQUEST FOR RELIEF

53. According to DCA Trust and as elaborated on in it's Memorial on Merits dated 3 November 2014, the central dispute between it and ICANN in this IRP may be summarized as follows:

> 32. By preventing DCA'S application from proceeding through the new gTLD review process and by coordinating with the AUC and others to ensure that the AUC obtained the rights to .AFRICA, ICANN breached its obligations of independence, transparency and due process contained in its Articles of Incorporation and Bylaws, including its obligation to conduct itself consistent with its duty of good faith under relevant principles of international law.

54. According to DCA Trust, among other things, "instead of functioning as a disinterested regulator of a fair and transparent gTLD application process, ICANN used its authority and oversight over that process to assist ZACR and to eliminate its only competitor, DCA, from the process."

55. DCA Trust also advanced that, "as a result, ICANN deprived DCA of the right to compete for .AFRICA in accordance with the rules ICANN established for the new gTLD program, in breach of the Applicant Guidebook ("AGB") and ICANN's Articles of Incorporation and Bylaws."

16

56. In its 3 December 2014 Response to DCA's Memorial on the Merits, among other things, ICANN submitted that, "ICANN's conduct with respect to DCA's application for .AFRICA was fully consistent with ICANN's Bylaws, its Articles of Incorporation and the Applicant Guidebook. ICANN also pleaded that it acted through open and transparent processes, evaluated DCA's application for .AFRICA in accordance with the procedures set forth in the Guidebook, and followed the procedures set forth in its Bylaws in evaluating DCA's Request for Reconsideration."

57. ICANN advanced that, "DCA is using this IRP as a mean to challenge the right of African countries to support a specific (and competing) application for .AFRICA, and to rewrite the Guidebook."

58. ICANN also added that, "ICANN provided assistance to those who requested, cooperated with governmental authorities, and respected the consensus advice issued by the GAC, which speaks on behalf of the governments of the world."

59. In its Final Request for Relief filed on 23 May 2015, DCA Trust asked this Panel to:

> 1. Declare that the Board violated ICANN's Articles of Incorporation, Bylaws and the Applicant Guidebook (AGB);
> 2. Declare that DCA Trust is the prevailing party in this IRP and, consequently entitled to its costs in this proceeding; and
> 3. Recommend as a result of the Board violations a course of action for the Board to follow going forward.

60. In its response letter of 1 June 2015, ICANN confirmed that it did not object to the form of DCA Trust's requests above, even though it believes that the evidence does not support the declarations that DCA Trust seeks. ICANN did, however, object to the appropriateness of the request for recommendations on the ground that they are outside of the Panel's authority as set forth in the Bylaws.

## III.   THE ISSUES RAISED AND THE PANEL'S DECISION

61. After carefully considering the Parties' written and oral submissions, perusing the three witness statements filed and hearing *viva voce* the testimonies of the witnesses at the in-person hearing of this IRP in Washington, D.C., the Panel answers the following four questions put to it as follows:

17

1.      Did the Board act or fail to act in a manner inconsistent with ICANN's Articles of Incorporation, Bylaws or the Applicant Guidebook?

Answer: Yes.

2.      Can the IRP Panel recommend a course of action for the Board to follow as a consequence of any declaration that the Board acted or failed to act in a manner inconsistent with ICANN's Articles of Incorporation, Bylaws or the Applicant Guidebook (AGB)?

Answer: Yes.

3.      Who is the prevailing party in this IRP?

Answer: DCA Trust

4.      Who is responsible for bearing the costs of this IRP and the cost of the IRP Provider?

Answer: ICANN, in full.

## Summary of Panel's Decision

For reasons explained in more detail below, and pursuant to Article IV, Section 3, paragraph 11 (c) of ICANN's Bylaws, the Panel declares that both the actions and inactions of the Board with respect to the application of DCA Trust relating to the .AFRICA gTLD were inconsistent with the Articles of Incorporation and Bylaws of ICANN.

Furthermore, pursuant to Article IV, Section 3, paragraph 11 (d) of ICANN's Bylaws, the Panel recommends that ICANN continue to refrain from delegating the .AFRICA gTLD and permit DCA Trust's application to proceed through the remainder of the new gTLD application process.

Finally, DCA Trust is the prevailing party in this IRP and ICANN is responsible for bearing, pursuant to Article IV, Section 3, paragraph 18 of the Bylaws, Article 11 of Supplementary Procedures and Article 31 of the ICDR Rules, the totality of the costs of this IRP and the totality of the costs of the IRP Provider.

As per the last sentence of Article IV, Section 3, paragraph 18 of the Bylaws, DCA Trust and ICANN shall each bear their own expenses. The Parties shall also each bear their own legal representation fees.

## IV.   ANALYSIS OF THE ISSUES AND REASONS FOR THE PANEL'S DECISION

### 1)  Did the Board act or fail to act in a manner inconsistent with ICANN's Articles of Incorporation, Bylaws or the Applicant Guidebook?

62.  Before answering this question, the Panel considers it necessary to quickly examine and address the issue of "standard of review" as referred to by ICANN in its 3 December 2014 Response to DCA's Memorial on the Merits or the "law applicable to these proceedings" as pleaded by DCA Trust in its 3 November 2014 Memorial on the Merits.

63.  According to DCA Trust:

> 30. The version of ICANN's Articles of Incorporation and its Bylaws in effect at the time DCA filed its Request for IRP applies to these proceedings. [Articles of Incorporation of Internet Corporation for Assigned Names and Numbers (21 November 1998) and Bylaws of the Internet Corporation for Assigned Names and Numbers (11 April 2013)]. ICANN's agreement with the U.S. Department of Commerce, National Telecommunications & Information Administration ("NTIA"), the "Affirmation of Commitments," is also instructive, as it explains ICANN's obligations in light of its role as regulator of the Domain Name System ("DNS"). The standard of review is a _de novo_ "independent review" of whether the actions of the Board violated the Bylaws, with focus on whether the Board acted without conflict of interest, with due diligence and care, and exercised independent judgment in the best interests of ICANN and its many stakeholders. (Underlining added).

> 31. All of the obligations enumerated in these documents are to be carried out _first_ in conformity with "relevant principles of international law" and _second_ in conformity with local law. As explained by Dr. Jack Goldsmith in his Expert Report submitted in _ICM v. ICANN_, the reference to "principles of international law" in ICANN's Articles of Incorporation should be understood to include both customary international law and general principles of law.

64.  In response, ICANN submits that:

> 11. The IRP is a unique process available under ICANN's Bylaws for persons or entities that claim to have been materially and adversely affected by a decision or action of the ICANN Board, but only to the extent that Board action was inconsistent with ICANN's Bylaws or Articles. This IRP Panel is tasked with providing its opinion as to whether the challenged Board actions violated ICANN's Bylaws or Articles. ICANN's Bylaws specifically identify the deferential standard of review that the IRP Panel must apply when evaluating the actions of the ICANN Board, focusing on:

a. Did the Board act without conflict of interest in taking its decision?;

b. Did the Board exercise due diligence and care in having a reasonable amount of facts in front of them?; and

c. Did the Board members exercise independent judgment in taking the decision, believed to be in the best interests of the company?

12. DCA disregards the plain language of ICANN's Bylaws and relies instead on the IRP Panel's declaration in a prior Independent Review proceeding, *ICM v. ICANN*. However, *ICM* was decided in 2010 under a previous version of ICANN's Bylaws. In its declaration, the *ICM* Panel explicitly noted that ICANN's then-current Bylaws "d[id] not specify or imply that the [IRP] process provided for s[hould] (or s[hould] not) accord deference to the decisions of the ICANN Board." As DCA acknowledges, the version of ICANN's Bylaws that apply to this proceeding are the version as amended in April 2013. The current Bylaws provide for the deferential standard of review set forth above. [Underlining is added]

65. For the following reasons, the Panel is of the view that the standard of review is a *de novo*, objective and independent one examining whether the Board acted or failed to act in a manner inconsistent with ICANN's Articles of Incorporation and Bylaws.

66. ICANN is not an ordinary California nonprofit organization. Rather it has a large international purpose and responsibility to coordinate and ensure the stable and secure operation of the Internet's unique identifier systems.

67. Indeed, Article 4 of ICANN's Articles of Incorporation require ICANN to "operate for the benefit of the Internet community as a whole, carrying out its activities in conformity with relevant principles of international law and applicable international conventions and local law and, to the extent appropriate and consistent with these Articles and its Bylaws, through open and transparent processes that enable competition and open entry in Internet-related markets." ICANN's Bylaws also impose duties on it to act in an open, transparent and fair manner with integrity.

68. ICANN's Bylaws (as amended on 11 April 2013) which both Parties explicitly agree that applies to this IRP, reads in relevant parts as follows:

**ARTICLE IV: ACCOUNTABILITY AND REVIEW**

**Section 3. INDEPENDENT REVIEW OF BOARD ACTIONS**

1. In addition to the reconsideration process described in Section 2 of this Article, ICANN shall have in place a separate process for independent third-party review of Board actions alleged by an affected party to be inconsistent with the Articles of Incorporation or Bylaws.

[…]

4. Requests for such independent review shall be referred to an Independent Review Process Panel […], which shall be charged with comparing contested actions of the Board to Articles of Incorporation and Bylaws, and with declaring whether the Board has acted consistently with the provisions of those Articles of Incorporation and Bylaws. The IRP Panel must apply a defined standard of review to the IRP request, focusing on:

 a. did the Board act without conflict of interest in taking its decision?
 b. did the Board exercise due diligence and care in having a reasonable amount of facts in front of them?; and
 c. did the Board members exercise independent judgment in taking the decision, believed to be in the best interests of the company?

69. Section 8 of the Supplementary Procedures similarly subject the IRP to the standard of review set out in subparagraphs a., b., and c., above, and add:

If a requestor demonstrates that the ICANN Board did not make a reasonable inquiry to determine it had sufficient facts available, ICANN Board members had a conflict of interest in participating in the decision, or the decision was not an exercise in independent judgment, believed by the ICANN Board to be in the best interests of the company, after taking account of the internet community and the global public interest, the requestor will have established proper grounds for review.

70. In the Panel's view, Article IV, Section 3, and Paragraph 4 of ICANN's Bylaws (reproduced above) – the Independent Review Process – was designed and set up to offer the Internet community, a *de novo, objective and independent* accountability process that would ensure that ICANN acted in a manner consistent with ICANN's Articles of Incorporation and Bylaws.

71. Both ICANN's Bylaws and the Supplementary Rules require an IRP Panel to *examine* and *decide* whether the Board has acted consistently with the provisions of the Articles of Incorporation and Bylaws. As ICANN's Bylaws explicitly put it, an IRP Panel is "*charged with* comparing contested actions of the Board […], and with *declaring* whether the Board has acted consistently with the provisions of the Articles of Incorporation and Bylaws.

21

Exhibit A - Pg 049

72. The IRP is the only independent third party process that allows review of board actions to ensure their consistency with the Articles of Incorporation or Bylaws. As already explained in this Panel's 14 August 2014 Declaration on the IRP Procedure ("August 2014 Declaration"), the avenues of accountability for applicants that have disputes with ICANN do *not* include resort to the courts. Applications for gTLD delegations are governed by ICANN's Guidebook, which provides that applicants waive all right to resort to the courts:

> Applicant hereby releases ICANN […] from any and all claims that arise out of, are based upon, or are in any way related to, any action or failure to act by ICANN […] in connection with ICANN's review of this application, investigation, or verification, any characterization or description of applicant or the information in this application, any withdrawal of this application or the decision by ICANN to recommend or not to recommend, the approval of applicant's gTLD application.   APPLICANT AGREES NOT TO CHALLENGE, IN COURT OR ANY OTHER JUDICIAL FORA, ANY FINAL DECISION MADE BY ICANN WITH RESPECT TO THE APPLICATION, AND IRREVOCABLY WAIVES ANY RIGHT TO SUE OR PROCEED IN COURT OR ANY OTHER JUDICIAL FORA ON THE BASIS OF ANY OTHER LEGAL CLAIM AGAINST ICANN ON THE BASIS OF ANY OTHER LEGAL CLAIM.

73. Thus, assuming that the foregoing waiver of any and all judicial remedies is valid and enforceable, then the only and ultimate "accountability" remedy for an applicant is the IRP.

74. As previously decided by this Panel, such accountability requires an organization to explain or give reasons for its activities, accept responsibility for them and to disclose the results in a transparent manner.

75. Such accountability also requires, to use the words of the IRP Panel in the *Booking.com B.V. v. ICANN* (ICDR Case Number: 50-20-1400-0247), this IRP Panel to "objectively" determine whether or not the Board's actions are in fact consistent with the Articles of Incorporation, Bylaws and Guidebook, which this Panel, like the one in *Booking.com* "understands as requiring that the Board's conduct be appraised independently, and without any presumption of correctness."

76. The Panel therefore concludes that the "standard of review" in this IRP is a *de novo, objective and independent* one, which does not require any presumption of correctness.

77. With the above in mind, the Panel now turns it mind to whether or not the Board in this IRP acted or failed to act in a manner inconsistent

22

with ICANN's Articles of Incorporation, Bylaws or the Applicant Guidebook.

**DCA Trust's Position**

78. In its 3 November 2014 Memorial on the Merits, DCA Trust criticizes ICANN for variety of shortcomings and breaches relating to the Articles of Incorporation, Bylaws and Applicant Guidebook. DCA Trust submits:

> 32. By preventing DCA's application from proceeding through the new gTLD review process and by coordinating with the AUC and others to ensure that the AUC obtained the rights to .AFRICA, ICANN breached its obligations of independence, transparency and due process contained in its Articles of Incorporation and Bylaws, including its obligation to conduct itself consistent with its duty of good faith under relevant principles of international law.

79. DCA Trust also pleads that ICANN breached its Articles of Incorporation and Bylaws by discriminating against DCA Trust and failing to permit competition for the .AFRICA gTLD, ICANN abused it Regulatory authority in its differential treatment of the ZACR and DCA Trust applications, and in contravention of the rules for the New gTLD Program, ICANN colluded with AUC to ensure that the AUC would obtain control over .AFRICA.

80. According to DCA Trust:

> 34. ICANN discriminated against DCA and abused its regulatory authority over new gTLDs by treating it differently from other new gTLD applicants without justification or any rational basis— particularly relative to DCA's competitor ZACR—and by applying ICANN's policies in an unpredictable and inconsistent manner so as to favor DCA's competitor for .AFRICA. ICANN staff repeatedly disparaged DCA and portrayed it as an illegitimate bidder for .AFRICA, and the Board failed to stop the discriminatory treatment despite protests from DCA.

> 35. Moreover, ICANN staff worked with InterConnect to ensure that ZACR, but not DCA, would be able to pass the GNP evaluation, even going so far as to draft a letter supporting ZACR for the AUC to submit back to ICANN. While ICANN staff purported to hold DCA to the strict geographic support requirement set forth in the AGB, once DCA was removed from contention for .AFRICA, ICANN staff immediately bypassed these very same rules in order to allow ZACR's application to pass the GNP evaluation. After DCA's application was pulled from processing on 7 June 2013, ICANN staff directed InterConnect to equate the AUC's support for ZACR's application as support from 100% of African governments. This was a complete change of policy for ICANN, which had insisted (until DCA's application was no longer being considered) that the AUC endorsement was not material to the geographic requirement.

36. However, none of the AUC statements ZACR submitted were adequate endorsements under the AGB, either. ICANN staff then took the remarkable step of drafting the AUC endorsement letter in order to enable ZACR to pass review. The Director of gTLD Operations, Trang Nguyen, personally composed an endorsement letter corresponding to all the AGB requirements for Commissioner Ibrahim's signature. Once Commissioner Ibrahim responded with a signed, stamped copy of the letter incorporating minor additions, ICANN staff rushed to pass ZACR's application just over one week later.

37. In its Response to the GAC Advice rendered against its application, DCA raised concerns that the two .AFRICA applications had been treated differently, though at the time it had no idea of just how far ICANN was going or would go to push ZACR's application through the process. Apparently the NGPC failed to make any inquiry into those allegations. .AFRICA was discussed at one meeting only, and there is no rationale listed for the NGPC's decision in the "Approved Resolutions" for the 4 June 2013 meeting. An adequate inquiry into ICANN staff's treatment of DCA's and ZACR's application—even simply asking the Director of gTLD Operations whether there was any merit to DCA's concerns—would have revealed a pattern of discriminatory behavior against DCA and special treatment by both ICANN staff and the ICANN Board in favor of ZACR's application.

38. In all of these acts and omissions, ICANN breached the AGB and its own Articles of Incorporation and Bylaws, which require it to act in good faith, avoid discriminating against any one party, and ensure open, accurate and unbiased application of its policies. Furthermore, ICANN breached principles of international law by failing to exercise its authority over the application process in good faith and committing an abuse of right by ghost-writing an endorsement letter for ZACR and the AUC, and then decreeing that the letter was all that would be needed for ZACR to pass. Finally, the Board's failure to inquire into the actions of its staff, even when on notice of the myriad of discriminatory actions, violates its obligation to comply with its Bylaws with appropriate care and diligence.

81. DCA Trust submits that the NGPC breached ICANN's Articles of Incorporation and Bylaws by failing to apply ICANN's Procedures in a neutral and objective manner with procedural fairness, when it accepted the GAC Objection Advice against DCA Trust, the NGPC should have investigated questions about the GAC Objection Advice being obtained through consensus, and the NGPC should have consulted with an independent expert about the GAC advice given that the AUC used the GAC to circumvent the AGB's community objection procedures.

82. According to DCA Trust:

44. The decision of the NGPC, acting pursuant to the delegated authority of the ICANN Board, to accept the purported "consensus" GAC Objection Advice, violated ICANN's Articles of Incorporation and Article III § 1 of its Bylaws, requiring transparency, consistency and fairness. ICANN ignored

24

Exhibit A - Pg 052

the serious issues raised by DCA and others with respect to the rendering and consideration of the GAC Objection Advice, breaching its obligation to operate "to the maximum extent possible in an open and transparent manner and consistent with procedures designed to ensure fairness." It also breaches ICANN's obligation under Article 4 of its Articles of Incorporation to abide by principles of international law, including good faith application of rules and regulations and the prohibition on the abuse of rights.

45. The NGPC gave undue deference to the GAC and failed to investigate the serious procedural irregularities and conflicts of interest raised by DCA and others relating to the GAC's Objection Advice on .AFRICA. ICANN had a duty under principles of international law to exercise good faith and due diligence in evaluating the GAC advice rather than accepting it wholesale and without question, despite having notice of the irregular manner in which the advice was rendered. Importantly, ICANN was well aware that the AUC was using the GAC to effectively reserve .AFRICA for itself, pursuant to ICANN's own advice that it should use the GAC for that purpose and contrary to the New gTLD Program objective of enhancing competition for TLDs. The AUC's very presence on the GAC as a member rather than an observer demonstrates the extraordinary lengths ICANN took to ensure that the AUC was able to reserve .AFRICA for its own use notwithstanding the new gTLD application process then underway.

46. The ICANN Board and staff members had actual knowledge of information calling into question the notion that there was a consensus among the GAC members to issue the advice against DCA's application, prohibiting the application of the rule in the AGB concerning consensus advice (which creates a "strong presumption" for the Board that a particular application "should not proceed" in the gTLD evaluation process).The irregularities leading to the advice against DCA's application included proposals offered by Alice Munyua, who no longer represented Kenya as a GAC advisor at the time, and the fact that the genuine Kenya GAC advisor expressly refused to endorse the advice. The GAC emails referenced in Ms. Dryden's witness statement clearly show that Kenya accepted the text only insofar as it supported the AUC's endeavor and not insofar as it objected to DCA's application. Finally, the ICANN Board knew very well that the AUC might attempt to use the GAC in an anticompetitive manner, since it was ICANN itself that informed the AUC it could use the GAC to achieve that very goal.

47. At a bare minimum, this information put ICANN Board and staff members on notice that further investigation into the rationale and support for the GAC's decision was necessary. During the very meeting wherein the NGPC accepted the Objection Advice, the NGPC acknowledged that due diligence required a conversation with the GAC, even where the advice *was* consensus advice. The evidence shows that ICANN simply decided to push through the AUC's appointed applicant in order to allow the AUC to control .AFRICA, as it had previously requested.

48. Even if the GAC's Objection Advice could be characterized as "consensus" advice, the NGPC's failure to consult with an independent expert about the GAC's Objection Advice was a breach of ICANN's duty to act to the "maximum extent feasible in an open and transparent manner

and consistent with procedures designed to ensure fairness." The AGB specifically provides that when the Board is considering any form of GAC advice, it "may consult with independent experts, such as those designated to hear objections in the New gTLD Dispute Resolution Procedure, in cases where the issues raised in the GAC advice are pertinent to one of the subject matter areas of the objection procedures."

49. Given the unique circumstances surrounding the applications for .AFRICA—namely that one applicant was the designee of the AUC, which wanted to control .AFRICA without competition— ICANN should not have simply accepted GAC Objection Advice, proposed and pushed through by the AUC. If it was in doubt as to how to handle GAC advice sponsored by DCA's only competitor for .AFRICA, it could have and should have consulted a third-party expert in order to obtain appropriate guidance. Its failure to do so was, at a minimum, a breach of ICANN's duty of good faith and the prohibition on abuse of rights under international law. In addition, in light of the multiple warning signs identified by DCA in its Response to the GAC Objection Advice and its multiple complaints to the Board, failure to consult an independent expert was certainly a breach of the Board's duty to ensure its fair and transparent application of its policies and its duty to promote and protect competition.

83. DCA Trust also submits that the NGPC breached ICANN's Articles of Incorporation and Bylaws by failing to apply its procedures in a neutral and objective manner, with procedural fairness, when it approved the BGC's recommendation not to reconsider the NGPC's acceptance of the GAC Objection Advice against DCA.

84. According to DCA Trust:

50. Not only did the NGPC breach ICANN's Articles of Incorporation and its Bylaws by accepting the GAC's Objection Advice, but the NGPC also breached ICANN's Articles of Incorporation and its Bylaws by approving the BGC's recommendation not to reconsider the NGPC's earlier decision to accept the GAC Objection Advice. Not surprisingly, the NGPC concluded that its earlier decision should not be reconsidered.

51. First, the NGPC's decision not to review its own acceptance of the GAC Objection Advice lacks procedural fairness, because the NGPC literally reviewed its own decision to accept the Objection Advice. It is a well-established general principle of international law that a party cannot be the judge of its own cause. No independent viewpoint entered into the process. In addition, although Mr. Silber recused himself from the vote on .AFRICA, he remained present for the entire discussion of .AFRICA, and Mr. Disspain apparently concluded that he did not feel conflicted, so both participated in the discussion and Mr. Disspain voted on DCA's RFR.

52. Second, the participation of the BGC did not provide an independent intervention into the NGPC's decision-making process, because the BGC is primarily a subset of members of the NGPC. At the time the BGC made its recommendation, the majority of BGC members were also members of the NGPC.

26

53. Finally, the Board did not exercise due diligence and care in accepting the BGC's recommendation, because the BGC recommendation essentially proffered the NGPC's inadequate diligence in accepting the GAC Objection Advice in the first place, in order to absolve the NGPC of the responsibility to look into any of DCA's grievances in the context of the Request for Review. The basis for the BGC's recommendation to deny was that DCA did not state proper grounds for reconsideration, because failure to follow correct procedure is not a ground for reconsideration, and DCA did not identify the actual information an independent expert would have provided, had the NGPC consulted one. Thus, the BGC essentially found that the NGPC did not fail to take account of material information, because the NGPC did not have before it the material information that would have been provided by an independent expert's viewpoint. The BGC even claimed that if DCA had wanted the NGPC to exercise due diligence and consult an independent expert, DCA should have made such a suggestion in its Response to the GAC Objection Advice. Applicants should not have to remind the Board to comply with its Bylaws in order for the Board to exercise due diligence and care.

54. ICANN's acts and omissions with respect to the BGC's recommendation constitute further breaches of ICANN's Bylaws and Articles of Incorporation, including its duty to carry out its activities in good faith and to refrain from abusing its position as the regulator of the DNS to favor certain applicants over others.

85.  Finally, DCA Trust pleads that:

[As] a result of the Board's breaches of ICANN's Articles of Incorporation, Bylaws and general principles of international law, ICANN must halt the process of delegating .AFRICA to ZACR and ZACR should not be permitted to retain the rights to .AFRICA it has procured as a result of the Board's violations. Because ICANN's handling of the new gTLD application process for .AFRICA was so flawed and so deeply influenced by ICANN's relationships with various individuals and organizations purporting to represent "the African community," DCA believes that any chance it may have had to compete for .AFRICA has been irremediably lost and that DCA's application could not receive a fair evaluation even if the process were to be re-set from the beginning. Under the circumstances, DCA submits that ICANN should remove ZACR's application from the process altogether and allow DCA's application to proceed under the rules of the New gTLD Program, allowing DCA up to 18 months to negotiate with African governments to obtain the necessary endorsements so as to enable the delegation and management of the .AFRICA string.

### ICANN's Position

86.  In its Response to DCA's Memorial on the Merits filed on 3 December 2014 ("ICANN Final Memorial"), ICANN submits that:

2.  [...] Pursuant to ICANN's New gTLD Applicant Guidebook ("Guidebook"), applications for strings that represent geographic regions— such as "Africa"—require the support of at least 60% of the respective national governments in the relevant region. As DCA has acknowledged on

multiple occasions, including in its Memorial, DCA does not have the requisite governmental support; indeed, DCA now asks that ICANN be required to provide it with eighteen more months to try to gather the support that it was supposed to have on the day it submitted its application in 2012.

3. DCA is using this IRP as a means to challenge the right of African countries to support a specific (and competing) application for .AFRICA, and to rewrite the Guidebook. The Guidebook provides that countries may endorse multiple applications for the same geographic string. However, in this instance, the countries of Africa chose to endorse only the application submitted by ZA Central Registry ("ZACR") because ZACR prevailed in the Request for Proposal ("RFP") process coordinated by the African Union Commission ("AUC"), a process that DCA chose to boycott. There was nothing untoward about the AUC's decision to conduct an RFP process and select ZACR, nor was there anything inappropriate about the African countries' decision to endorse only ZACR's application.

4. Subsequently, as they had every right to do, GAC representatives from Africa urged the GAC to issue advice to the ICANN Board that DCA's application for .AFRICA not proceed (the "GAC Advice"). One or more countries from Africa—or, for that matter, from any continent—present at the relevant GAC meeting could have opposed the issuance of this GAC Advice, yet not a single country stated that it did not want the GAC to issue advice to the ICANN Board that DCA's application should not proceed. As a result, under the GAC's rules, the GAC Advice was "consensus" advice.

5. GAC consensus advice against an application for a new gTLD creates a "strong presumption" for ICANN's Board that the application should not proceed. In accordance with the Guidebook's procedures, the Board's New gTLD Program Committee (the "NGPC") considered the GAC Advice, considered DCA's response to the GAC Advice, and properly decided to accept the GAC Advice that DCA's application should not proceed. As ZACR's application for .AFRICA subsequently passed all evaluation steps, ICANN and ZACR entered into a registry agreement for the operation of .AFRICA. Following this Panel's emergency declaration, ICANN has thus far elected not to proceed with the delegation of the .AFRICA TLD into the Internet root zone.

6. DCA's papers contain much mudslinging and many accusations, which frankly do not belong in these proceedings. According to DCA, the entire ICANN community conspired to prevent DCA from being the successful applicant for .AFRICA. However, the actions that DCA views as nefarious were, in fact, fully consistent with the Guidebook. They also were not actions taken by the Board or the NGPC that in any way violated ICANN's Bylaws or Articles, the only issue that this IRP Panel is tasked with assessing.

87. ICANN submits that the Board properly advised the African Union's member states of the Guidebook Rules regarding geographic strings, the NGPC did not violate the Bylaws or Articles of Incorporation by accepting the GAC Advice, the AUC and the African GAC members properly supported the .AFRICA applicant chosen through the RFP

process, the GAC issued consensus advice opposing DCA's application and the NGPC properly accepted the consensus GAC Advice.

88.   According to ICANN:

13. DCA's first purported basis for Independent Review is that ICANN improperly responded to a 21 October 2011 communiqué issued by African ministers in charge of Communication and Information Technologies for their respective countries ("Dakar Communiqué"). In the Dakar Communiqué, the ministers, acting pursuant to the Constitutive Act of the African Union, committed to continued and enhanced participation in ICANN and the GAC, and requested that ICANN's Board take numerous steps aimed at increasing Africa's representation in the ICANN community, including that ICANN "include ['Africa'] and its representation in any other language on the Reserved Names List in order [for those strings] to enjoy [] special legislative protection, so [they could be] managed and operated by the structure that is selected and identified by the African Union."

14. As DCA acknowledges, in response to the request in the Dakar Communiqué that .AFRICA (and related strings) be reserved for a operator of the African ministers' own choosing, ICANN advised that .AFRICA and its related strings could not be placed on the Reserved Names List because ICANN was "not able to take actions that would go outside of the community-established and documented guidelines of the program." Instead, ICANN explained that, pursuant to the Guidebook, "protections exist that w[ould] allow the African Union and its member states to play a prominent role in determining the outcome of any application for these top-level domain name strings."

15. It was completely appropriate for ICANN to point the AU member states to the publicly-stated Guidebook protections for geographic names that were put in place to address precisely the circumstance at issue here— where an application for a string referencing a geographic designation did not appear to have the support of the countries represented by the string. DCA argues that ICANN was giving "instructions . . . as to how to bypass ICANN's own rules," but all ICANN was doing was responding to the Dakar Communiqué by explaining the publicly-available rules that ICANN already had in place. This conduct certainly did not violate ICANN's Bylaws or Articles.

16. In particular, ICANN explained that, pursuant to the Guidebook, "Africa" constitutes a geographic name, and therefore any application for .AFRICA would need: (i) documented support from at least 60% of the national governments in the region; and (ii) no more than one written statement of objection . . . from "relevant governments in the region and/or from public authorities associated with the continent and region." Next, ICANN explained that the Guidebook provides an opportunity for the GAC, whose members include the AU member states, to provide "Early Warnings" to ICANN regarding specific gTLD applications. Finally, ICANN explained that there are four formal objection processes that can be initiated by the public, including the Community Objection process, which may be filed where there is "substantial opposition to the gTLD application from a significant

portion of the community to which the gTLD string may be explicitly or implicitly targeted. Each of these explanations was factually accurate and based on publicly available information. Notably, ICANN did not mention the possibility of GAC consensus advice against a particular application (and, of course, such advice could not have occurred if even a single country had voiced its disagreement with that advice during the GAC meeting when DCA's application was discussed).

17. DCA's objection to ICANN's response to the Dakar Communiqué reflects nothing more than DCA's dissatisfaction with the fact that African countries, coordinating themselves through the AUC, opposed DCA's application. However, the African countries had every right to voice that opposition, and ICANN's Board acted properly in informing those countries of the avenues the Guidebook provided them to express that opposition.

18. In another attempt to imply that ICANN improperly coordinated with the AUC, DCA insinuates that the AUC joined the GAC at ICANN's suggestion. ICANN's response to the Dakar Communiqué does not even mention this possibility. Further, in response to DCA's document requests, ICANN searched for communications between ICANN and the AUC relating to the AUC becoming a voting member of the GAC, and the search revealed no such communications. This is not surprising given that ICANN has no involvement in, much less control over, whether the GAC grants to any party voting membership status, including the AUC; that decision is within the sole discretion of the GAC. ICANN's Bylaws provide that membership in the GAC shall be open to "multinational governmental organizations and treaty organizations, on the invitation of the [GAC] through its Chair." In any event, whether the AUC was a voting member of the GAC is irrelevant to DCA's claims. As is explained further below, the AUC alone would not have been able to orchestrate consensus GAC Advice opposing DCA's application.

19. DCA's next alleged basis for Independent Review is that ICANN's NGPC improperly accepted advice from the GAC that DCA's application should not proceed. However, nearly all of DCA's Memorial relates to conduct of the AUC, the countries of the African continent, and the GAC. None of these concerns is properly the subject of an Independent Review proceeding because they do not implicate the conduct of the ICANN Board or the NGPC. The only actual decision that the NGPC made was to accept the GAC Advice that DCA's application for .AFRICA should not proceed, and that decision was undoubtedly correct, as explained below.

20. Although the purpose of this proceeding is to test whether ICANN's Board (or, in this instance, the NGPC) acted in conformance with its Bylaws and Articles, ICANN addresses the conduct of third parties in the next few sections because that additional context demonstrates that the NGPC's decision to accept the GAC Advice—the only decision reviewable here—was appropriate in all aspects.

21. After DCA's application was posted for public comment (as are all new gTLD applications), sixteen African countries—Benin, Burkina Faso, Comoros, Cameroon, Democratic Republic of Congo, Egypt, Gabon, Ghana, Kenya, Mali, Morocco, Nigeria, Senegal, South Africa, Tanzania and Uganda—submitted GAC Early Warnings regarding DCA's application.

Early Warnings are intended to "provid[e] [] applicant[s] with an indication that the[ir] application is seen as potentially sensitive or problematic by one or more governments." These African countries used the Early Warnings to notify DCA that they had requested the AUC to conduct an RFP for .AFRICA, that ZACR had been selected via that RFP, and that they objected to DCA's application for .AFRICA. They further notified DCA that they did not believe that DCA had the requisite support of 60% of the countries on the African continent.

22. DCA minimizes the import of these Early Warnings by arguing that they did not involve a "permissible reason" for objecting to DCA's application. But DCA does not explain how any of these reasons was impermissible, and the Guidebook explicitly states that Early Warnings "may be issued for any reason." DCA demonstrated the same dismissive attitude towards the legitimate concerns of the sixteen governments that issued Early Warnings by arguing to the ICANN Board and the GAC that the objecting governments had been "teleguided (or manipulated)."

23. In response to these Early Warnings, DCA conceded that it did not have the necessary level of support from African governments and asked the Board to "waive th[e] requirement [that applications for geographic names have the support of the relevant countries] because of the confusing role that was played by the African Union." DCA did not explain how the AUC's role was "confusing," and DCA ignored the fact that, pursuant to the Guidebook, the AUC had every right to promote one applicant over another. The AUC's decision to promote an applicant other than DCA did not convert the AUC's role from proper to improper or from clear to confusing.

24. Notably, long before the AUC opposed DCA's application, DCA itself recognized the AUC's important role in coordinating continent-wide technology initiatives. In 2009, DCA approached the AUC for its endorsement prior to seeking the support of individual African governments. DCA obtained the AUC's support at that time, including the AUC's commitment to "assist[] in the coordination of [the] initiative with African Ministers and Governments."

25. The AUC, however, then had a change of heart (which it was entitled to do, particularly given that the application window for gTLD applications had not yet opened and would not open for almost two more years). On 7 August 2010, African ministers in charge of Communication and Information Technologies for their respective countries signed the Abuja Declaration. In that declaration, the ministers requested that the AUC coordinate various projects aimed at promoting Information and Communication Technologies projects on the African continent. Among those projects was "set[ting] up the structure and modalities for the [i]mplementation of the DotAfrica Project."

26. Pursuant to that mandate, the AUC launched an open RFP process, seeking applications from private organizations (including DCA) interested in operating the .AFRICA gTLD. The AUC notified DCA that "following consultations with relevant stakeholders . . . [it] no longer endorse[d] individual initiatives [for .AFRICA]." Instead, "in coordination with the Member States . . . the [AUC] w[ould] go through [an] open [selection]

process"—hardly an inappropriate decision (and not a decision of ICANN or its Board). DCA then refused to participate in the RFP process, thereby setting up an inevitable clash with whatever entity the AUC selected. When DCA submitted its gTLD application in 2012 and attached its 2009 endorsement letter from the AUC, DCA knew full well (but did not disclose) that the AUC had retracted its support.

27. In sum, the objecting governments' concerns were the result of DCA's own decision to boycott the AUC's selection process, resulting in the selection of a different applicant, ZACR, for .AFRICA. Instead of addressing those governments' concerns, and instead of obtaining the necessary support of 60% of the countries on the African continent, DCA asked ICANN to re-write the Guidebook in DCA's favor by eliminating the most important feature of any gTLD application related to a geographic region—the support of the countries in that region. ICANN, in accordance with its Bylaws, Articles and Guidebook, properly ignored DCA's request to change the rules for DCA's benefit.

28. At its 10 April 2013 meeting in Beijing, the GAC advised ICANN that DCA's application for .AFRICA should not proceed.[40] As noted earlier, the GAC operates on the basis of consensus: if a single GAC member at the 10 April 2013 meeting (from any continent, not just from Africa) had opposed the advice, the advice would not have been considered "consensus."[41] As such, the fact that the GAC issued consensus GAC Advice against DCA's application shows that not a single country opposed that advice. Most importantly, this included Kenya: Michael Katundu, the GAC Representative for Kenya, and Kenya's only official GAC representative,was present at the 10 April 2013 Beijing meeting and did not oppose the issuance of the consensus GAC Advice.

29. DCA attempts to argue that the GAC Advice was not consensus advice and relies solely on the purported email objection of Sammy Buruchara, Kenya's GAC advisor (as opposed to GAC representative). As a preliminary matter (and as DCA now appears to acknowledge), the GAC's Operating Principles require that votes on GAC advice be made in person. Operating Principle 19 provides that:

If a Member's accredited representative, or alternate representative, is not present at a meeting, then it shall be taken that the Member government or organisation is not represented at that meeting. Any decision made by the GAC without the participation of a Member's accredited representative shall stand and nonetheless be valid.

Similarly, Operating Principle 40 provides:

One third of the representatives of the Current Membership with voting rights shall constitute a quorum at any meeting. A quorum shall only be necessary for any meeting at which a decision or decisions must be made. The GAC may conduct its general business face-to-face or online.

25. DCA argues that Mr. Buruchara objected to the GAC Advice via email, but even if objections could be made via email (which they cannot), Mr. Katundu, Kenya's GAC representative who was in Beijing at the GAC

meeting, not Mr. Buruchara, Kenya's GAC advisor, was authorized to speak on Kenya's behalf. Accordingly, under the GAC rules, Mr. Buruchara's email exchanges could not have constituted opposition to the GAC Advice.

26. Moreover, the full text of Mr. Buruchara's emails (only a small portion of which DCA included in it IRP Notice) demonstrate that he withdrew any opposition to the issuance of the consensus GAC Advice against DCA's application. And, tellingly, DCA did not to submit a declaration from Mr. Buruchara, which might have provided context or support for DCA's argument.

27. The complete email chain discussing the proposed advice included several branches and a number of drafts of, and revisions to, the proposed GAC advice. Mr. Buruchara's last email on the topic was made in response to Michel Tchonang, Cameroon's GAC representative. Mr. Tchonang had written to express his disagreement with Mr. Buruchara's earlier-expressed opposition to the proposed GAC advice. Mr. Tchonang reminded Mr. Buruchara that Kenya had previously agreed to the Abuja Declaration, and that Kenya's ICT minister had written a letter supporting the RFP process for .AFRICA. Mr. Buruchara responded that he "did not object to the AUC's position," and that while Kenya "support[ed] the AUC's preferred candidate," ZACR, he would prefer that the GAC "support/endorse the preferred candidate and leave the rest of the process to the Evaluation committee." Mr. Tchonang responded: "We are a team, let us have a unified voice." At this, Mr. Buruchara responded that "[c]ertainly as AUC, we are united on this one and I am glad my position is clarified."

28. Notably, immediately prior to becoming Kenya's GAC advisor, Mr. Buruchara had served as the chairman of DCA's Strategic Advisory Board. But despite Mr. Buruchara's close ties with DCA and with Ms. Bekele, the Kenyan government had: (i) endorsed the Abuja Declaration; (ii) supported the AUC's processes for selecting the proposed registry operator; and (iii) issued an Early Warning objecting to DCA's application.

In other words, the Kenyan government was officially on record as supporting ZACR's application and opposing DCA's application, regardless of what Mr. Buruchara was writing in emails.

29. Furthermore, correspondence produced by DCA in this proceeding (but not referenced in either of DCA's briefs) shows that, despite Ms. Bekele's and Mr. Buruchara's efforts to obtain the support (or at least non-opposition) of the Kenyan government, the Kenyan government had rescinded its earlier support of DCA in favor of ZACR. For example, in February 2013, Ms. Bekele emailed a Kenyan government official asking that Kenya issue an Early Warning regarding ZACR's application. The official responded that he would have to escalate the matter to the Foreign Ministry because the Kenyan president "was part of the leaders of the AU who endorsed AU to be the custodian of dot Africa." On 10 April 2013, Ms. Bekele emailed Mr. Buruchara, asking him to make further points objecting to the proposed GAC advice. Mr. Buruchara responded that he was unable to do so because the Kenyan government had been informed (erroneously informed, according to Mr. Buruchara), that Mr. Buruchara was "contradict[ing] the Heads of State agreement in Abuja." On 8 July 2013,

Exhibit A - Pg 061

Mr. Buruchara explained to Ms. Bekele that he "stuck [his] neck out for DCA inspite [*sic*] of lack of Govt support."

30. Because DCA did not submit a declaration from Mr. Buruchara (and because Ms. Bekele's declaration is, of course, limited to her own interpretation of email correspondence drafted by others), the Panel is left with a record demonstrating that: (i) Mr.

Buruchara was not authorized by the Kenyan government to oppose the GAC Advice; (ii) even if he had been so authorized, Mr. Buruchara withdrew his initial purported opposition to the GAC Advice; and (iii) the actual GAC representative from Kenya (Mr. Katundu) attended the 10 April 2013 meeting in Beijing and did not oppose the issuance of the consensus GAC Advice that DCA's application for .AFRICA should not proceed.

31. In short, DCA's primary argument in support of this Independent Review proceeding—that the GAC should not have issued consensus advice against DCA's application—is not supported by any evidence and is, instead, fully contradicted by the evidence. And, of course, Independent Review proceedings do not test whether the GAC's conduct was appropriate (even though in this instance there is no doubt that the GAC appropriately issued consensus advice).

32. As noted above, pursuant to the Guidebook, GAC consensus advice that a particular application should not proceed creates a "strong presumption for the ICANN Board that the application should not be approved." The ICANN Board would have been required to develop a reasoned and well-supported rationale for not accepting the consensus GAC Advice; no such reason existed at the time the NGPC resolved to accept that GAC Advice (5 June 2013), and no such reason has since been revealed. The consensus GAC Advice against DCA's application was issued in the ordinary course, it reflected the sentiment of numerous countries on the African continent, and it was never rescinded.

33. DCA's objection to the Board's acceptance of the GAC Advice is twofold. First, DCA argues that the NGPC failed to investigate DCA's allegation that the GAC advice was not consensus advice. Second, DCA argues that the NGPC should have consulted an independent expert prior to accepting the advice. DCA also argued in its IRP Notice that two NGPC members had conflicts of interest when they voted to accept the GAC Advice, but DCA does not pursue that argument in its Memorial (and the facts again demonstrate that DCA's argument is incorrect).

34. As to the first argument, the Guidebook provides that, when the Board receives GAC advice regarding a particular application, it publishes that advice and notifies the applicant. The applicant is given 21 days from the date of the publication of the advice to submit a response to the Board. Those procedures were followed here. Upon receipt of the GAC Advice, ICANN posted the advice and provided DCA with an opportunity to respond. DCA submitted a lengthy response explaining "[w]hy DCA Trust disagree[d]" with the GAC Advice. A primary theme was that its application had been unfairly blocked by the very countries whose support the Guidebook required DCA to obtain, and that the AUC should not have been allowed to endorse an applicant for .AFRICA. DCA argued that it had been

unfairly "victimized" and "muzzled into insignificance" by the "collective power of the governments represented at ICANN," and that "the issue of government support [should] be made irrelevant in the process so that both contending applications for .Africa would be allowed to move forward . . . ." In other words, DCA was arguing that the AUC's input was inappropriate, and DCA was requesting that ICANN change the Guidebook requirement regarding governmental support for geographic names in order to accommodate DCA. ICANN's NGPC reviewed and appropriately rejected DCA's arguments.

35. One of DCA's three "supplementary arguments," beginning on page 10 of its response to the GAC Advice, was that there had been no consensus GAC advice, in part allegedly evidenced by Mr. Buruchara's (incomplete) email addressed above. DCA, however, chose not to address the fact that: (i) DCA lacked the requisite support of the African governments; (ii) Mr. Buruchara was not the Kenyan GAC representative; (iii) Mr. Buruchara was not at the Beijing meeting; (iv) the government of Kenya had withdrawn any support it may have previously had for DCA's application; and (v) the actual Kenyan GAC representative (Mr. Katundu) was at the ICANN meeting in Beijing and did not oppose the issuance of the GAC Advice against DCA's application for .AFRICA. All of these facts were well known to DCA at the time of its response to the GAC Advice.

36. The NGPC's resolution accepting the GAC Advice states that the NGPC considered DCA's response prior to accepting the GAC Advice, and DCA presents no evidence to the contrary. DCA's disagreement with the NGPC's decision does not, of course, demonstrate that the NGPC failed to exercise due diligence in determining to accept the consensus GAC Advice.

37. As to DCA's suggestion that the NGPC should have consulted an independent expert, the Guidebook provides that it is within the Board's discretion to decide whether to consult with an independent expert:

ICANN will consider the GAC Advice on New gTLDs as soon as practicable. The Board may consult with independent experts, such as those designated to hear objections in the New gTLD Dispute Resolution Procedure, in cases where the issues raised in the GAC advice are pertinent to one of the subject matter areas of the objection procedures.

The NGPC clearly did not violate its Bylaws, Articles or Guidebook in deciding that it did not need to consult any independent expert regarding the GAC Advice. Because DCA's challenge to the GAC Advice was whether one or more countries actually had opposed the advice, there was no reason for the NGPC to retain an "expert" on that subject, and DCA has never stated what useful information an independent expert possibly could have provided.

89. ICANN also submits that the NGPC properly denied DCA's request for reconsideration, ICANN's actions following the acceptance of the GAC Advice are not relevant to the IRP, and in any event they were not improper, the ICANN staff directed the ICC to treat the two

African applications consistently, and ICANN staff did not violate any policy in drafting a template letter at the AUC request.

90.  According to ICANN:

38. DCA argues that the NGPC improperly denied DCA's Reconsideration Request, which sought reconsideration of the NGPC's acceptance of the GAC Advice. Reconsideration is an accountability mechanism available under ICANN's Bylaws and administered by ICANN's Board Governance Committee ("BGC"). DCA's Reconsideration Request asked that the NGPC's acceptance of the GAC Advice be rescinded and that DCA's application be reinstated. Pursuant to the Bylaws, reconsideration of a Board (or in this case NGPC) action is appropriate only where the NGPC took an action "without consideration of material information" or in "reliance on false or inaccurate material information."

39. In its Reconsideration Request, DCA argued (as it does here) that the NGPC failed to consider material information by failing to consult with an independent expert prior to accepting the GAC Advice. The BGC noted that DCA had not identified any material information that the NGPC had not considered, and that DCA had not identified what advice an independent expert could have provided to the NGPC or how such advice might have altered the NGPC's decision to accept the GAC Advice. The BGC further noted that, as discussed above, the Guidebook is clear that the decision to consult an independent expert is at the discretion of the NGPC.

40. DCA does not identify any Bylaws or Articles provision that the NGPC violated in denying the Reconsideration Request. Instead, DCA simply disagrees with the NGPC's determination that DCA had not identified any material information on which the NGPC failed to rely. That disagreement is not a proper basis for a Reconsideration Request or an IRP. DCA also argues (again without citing to the Bylaws or Articles) that, because the NGPC accepted the GAC Advice, the NGPC could not properly consider DCA's Reconsideration Request. In fact, the DCA's Reconsideration Request was handled exactly in the manner prescribed by ICANN's Bylaws: the BGC—a separate Board committee charged with considering Reconsideration Requests—reviewed the material and provided a recommendation to the NGPC. The NGPC then reviewed the BGC's recommendation and voted to accept it. In short, the various Board committees conducted themselves exactly as ICANN's Bylaws require.

41. The NGPC accepted the GAC Advice on 4 June 2013. As a result, DCA's application for .AFRICA did not proceed. In its Memorial, DCA attempts to cast aspersions on ICANN's evaluation of ZACR's application, but that evaluation has no bearing on whether the NGPC acted consistently with its Bylaws and Articles in handling the GAC advice related to DCA's application. Indeed, the evaluation of ZACR's application did not involve any action by ICANN's Board (or NGPC), and is therefore not a proper basis for Independent Review. Although the actions of ICANN's staff are not relevant to this proceeding, ICANN addresses DCA's allegations for the sake of thoroughness and because the record demonstrates that ZACR's application was evaluated fully in conformance with the Guidebook requirements.

36

42. DCA alleges that "ICANN staff worked with [the ICC] to ensure that ZACR, but not DCA, would be able to pass the GNP evaluation." DCA's argument is based on false and unsupported characterizations of the ICC's evaluation of the two .AFRICA applications.

43. First, DCA claims (without relevant citation) that ICANN determined that the AUC's endorsement would count as an endorsement from each of the AU's member states only after ICANN had stopped processing DCA's application. In fact, the record indicates that ICANN accepted the ICC's recommendation that the AUC's endorsement would qualify as an endorsement from each of the AU's member states while DCA's application was still in contention, at a time when the recommendation had the potential to benefit both applicants for .AFRICA (had DCA also in fact received the AUC's support).

44. The Guidebook provides that the Geographic Names Panel is responsible for "verifying the relevance and authenticity of supporting documentation." Accordingly, it was the ICC's responsibility to evaluate how the AUC's endorsement should be treated. The ICC recommended that the AUC's endorsement should count as an endorsement from each of the AU's member states. The ICC's analysis was based on the Abuja Declaration, which the ICC interpreted as "instruct[ing] the [AUC] to pursue the DotAfrica project, and in [the ICC's] independent opinion, provide[d] suitable evidence of support from relevant governments or public authorities." The evidence shows that ICANN accepted the ICC's recommendation before the NGPC accepted the GAC Advice regarding DCA's application— in a 26 April 2013 email discussing the preparation of clarifying questions regarding the AUC's letters of support, ICANN explained to the ICC that "if the applicant(s) is/are unable to obtain a revised letter of support from the AU [], they may be able to fulfill the requirements by approaching the individual governments."

45. DCA also claims that ICANN determined that endorsements from the UNECA would not be taken into account for geographic evaluations. This simply is not true. Pursuant to the ICC's advice, the UNECA's endorsement was taken into account. Like the AUC, the UNECA had signed letters of support for both DCA and ZACR. The ICC advised that because the UNECA was specifically named in the Abuja Declaration, it too should be treated as a relevant public authority. ICANN accepted the ICC's advice.

46. DCA argues that, after ICANN had stopped processing DCA's application, ICANN staff improperly assisted the AUC in drafting a support letter for ZACR. As is reflected in the clarifying questions the ICC drafted regarding the endorsement letters submitted on behalf of each of the two .AFRICA applications, the Guidebook contains specific requirements for letters of support from governments and public authorities. In addition to "clearly express[ing] the government's or public authority's support for or non- objection to the applicant's application," letters must "demonstrate the government's or public authority's understanding of the string being requested and its intended use" and that "the string is being sought through the gTLD application process and that the applicant is willing to accept the conditions under which the string will be available, i.e., entry into a registry agreement with ICANN . . . ". In light of these specific requirements, the Guidebook even includes a sample letter of support.

37

47. The first letter of support that the AUC submitted for ZACR's application did not follow the correct format and resulted in a clarifying question from the ICC. As a result, the AUC requested ICANN staff's assistance in drafting a letter that conformed to the Guidebook's requirements. ICANN staff drafted a template based on the sample letter of support in the Guidebook, and the AUC then made significant edits to that template. DCA paints this cooperation as nefarious, but there was absolutely nothing wrong with ICANN staff assisting the AUC, assistance that DCA would certainly have welcomed, and which ICANN would have provided, had the AUC been supporting DCA instead of ZACR.

## 91.  Finally, ICANN submits:

50. ICANN's conduct with respect to DCA's application for .AFRICA was fully consistent with ICANN's Bylaws, its Articles of Incorporation and the Applicant Guidebook. ICANN acted through open and transparent processes, evaluated DCA's application for .AFRICA in accordance with the procedures set forth in the Guidebook, and followed the procedures set forth in its Bylaws in evaluating DCA's Request for Reconsideration. ICANN provided assistance to those who requested, cooperated with governmental authorities, and respected the consensus advice issued by the GAC, which speaks on behalf of the governments of the world.

51. DCA knew, as did all applicants for new gTLDs, that some of the applications would be rejected. There can only be one registry operator for each gTLD string, and in the case of strings that relate to geographic regions, no application can succeed without the significant support of the countries in that region. There is no justification whatsoever for DCA's repeated urging that the support (or lack thereof) of the countries on the African continent be made irrelevant to the process.

52. Ultimately, the majority of the countries in Africa chose to support another application for the .AFRICA gTLD, and decided to oppose DCA's application. At a critical time, no country stood up to defend DCA's application. These countries—and the AUC— had every right to take a stand and to support the applicant of their choice. In this instance, that choice resulted in the GAC issuing consensus advice, which the GAC had every right to do. Nothing in ICANN's Bylaws or Articles, or in the Guidebook, required ICANN to challenge that decision, to ignore that decision, or to change the rules so that the input of the AUC, much less the GAC, would become irrelevant. To the contrary, the AUC's role with respect to the African community is critical, and it was DCA's decision to pursue a path at odds with the AUC that placed its application in jeopardy, not anything that ICANN (or ICANN's Board or the NGPC) did. The NGPC did exactly what it was supposed to do in this circumstance, and ICANN urges this IRP Panel to find as such. Such a finding would allow the countries of Africa to soon provide their citizens with what all parties involved believe to be a very important step for Africa – access to .AFRICA on the internet.

38

**The Panel's Decision**

92. The Panel in this IRP, has been asked to determine whether, in the case of the application of DCA Trust for the delegation of the .AFRICA top-level domain name in its 2012 General Top-Level Domains ("gTLD") Internet Expansion Program (the "New gTLD Program"), the Board acted or failed to act in a manner inconsistent with ICANN's Articles of Incorporation, Bylaws or the Applicant Guidebook?

93. After reviewing the documentation filed in this IRP, reading the Parties' respective written submissions, reading the written statements and listening to the testimony of the three witnesses brought forward, listening to the oral presentations of the Parties' legal representatives at the hearing in Washington, D.C., reading the transcript of the hearing, and deliberating, the Panel is of the unanimous view that certain actions and inactions of the ICANN Board (as described below) with respect to the application of DCA Trust relating to the .AFRICA gTLD were inconsistent with the Articles of Incorporation and Bylaws of ICANN.

94. ICANN is bound by its own Articles of Incorporation to act fairly, neutrally, non-discriminatorily and to enable competition. Article 4 of ICANN's Articles of Incorporation sets this out explicitly:

> 4. The Corporation shall operate for the benefit of the Internet community as a whole, carrying out its activities in conformity with relevant principles of international law and applicable international conventions and local law and, to the extent appropriate and consistent with these Articles and its Bylaws, through open and transparent processes that enable competition and open entry in Internet-related markets. To this effect, the Corporation shall cooperate as appropriate with relevant international organizations.

95. ICANN is also bound by its own Bylaws to act and make decisions "neutrally and objectively, with integrity and fairness."

96. These obligations and others are explicitly set out in a number of provisions in ICANN's Bylaws:

> **ARTICLE I: MISSION AND CORE (Council of Registrars) VALUES**
>
> **Section 2. CORE (Council of Registrars) VALUES**
>
> In performing its mission, the following core values should guide the decisions and actions of ICANN (Internet Corporation for Assigned Names and Numbers):

39

1. Preserving and enhancing the operational stability, reliability, security, and global interoperability of the Internet.

[…]

7. <u>Employing open and transparent policy development mechanisms</u> that (i) promote well-informed decisions based on expert advice, and (ii) ensure that those entities most affected can assist in the policy development process.

8. <u>Making decisions by applying documented policies neutrally and objectively, with integrity and fairness.</u>

9. <u>Acting with a speed that is responsive to the needs of the Internet while, as part of the decision-making process, obtaining informed input from those entities most affected.</u>

10. Remaining accountable to the Internet community through mechanisms that enhance ICANN (Internet Corporation for Assigned Names and Numbers)'s effectiveness.

11. While remaining rooted in the private sector, recognizing that governments and public authorities are responsible for public policy and duly taking into account governments' or public authorities' recommendations.

<u>These core values are deliberately expressed in very general terms, so that they may provide useful and relevant guidance in the broadest possible range of circumstances.</u> Because they are not narrowly prescriptive, the specific way in which they apply, individually and collectively, to each new situation will necessarily depend on many factors that cannot be fully anticipated or enumerated; and because they are statements of principle rather than practice, situations will inevitably arise in which perfect fidelity to all eleven core values simultaneously is not possible. <u>Any ICANN (Internet Corporation for Assigned Names and Numbers) body making a recommendation or decision shall exercise its judgment to determine which core values are most relevant and how they apply to the specific circumstances of the case at hand, and to determine, if necessary, an appropriate and defensible balance among competing values.</u>

**ARTICLE II: POWERS**

**Section 1. GENERAL POWERS**

Except as otherwise provided in the Articles of Incorporation or these Bylaws, <u>the powers of ICANN (Internet Corporation for Assigned Names and Numbers) shall be exercised by, and its property controlled and its business and affairs conducted by or under the direction of, the Board.</u>

**Section 3. NON-DISCRIMINATORY TREATMENT**

ICANN (Internet Corporation for Assigned Names and Numbers) shall not apply its standards, policies, procedures, or practices inequitably or single out any particular party for disparate treatment unless justified by

substantial and reasonable cause, such as the promotion of effective competition.

**ARTICLE III: TRANSPARENCY**

**Section 1. PURPOSE**

ICANN (Internet Corporation for Assigned Names and Numbers) and **its constituent bodies** shall operate to the maximum extent feasible in an open and transparent manner and consistent **with procedures designed to ensure fairness**. [Underlining and bold is that of the Panel]

97. As set out in Article IV (Accountability and Review) of ICANN's Bylaws, in carrying out its mission as set out in its Bylaws, ICANN should be accountable to the community for operating in a manner that is consistent with these Bylaws and with due regard for the core values set forth in Article I of the Bylaws.

98. As set out in Section 3 (Independent Review of Board Actions) of Article IV, "any person materially affected by a decision or action by the Board that he or she asserts is inconsistent with the Articles of Incorporation or Bylaws may submit a request for independent review of that decision or action. In order to be materially affected, the person must suffer injury or harm that is directly and casually connected to the Board's alleged violation of the Bylaws or Articles of Incorporation, and not as a result of third parties acting in line with the Board's action."

99. In this IRP, among the allegations advanced by DCA Trust against ICANN, is that the ICANN Board, and its constituent body, the GAC, breached their obligation to act transparently and in conformity with procedures that ensured fairness. In particular, DCA Trust criticizes the ICANN Board here, for allowing itself to be guided by the GAC, a body "with apparently no distinct rules, limited public records, fluid definitions of membership and quorums" and unfair procedures in dealing with the issues before it.

100. According to DCA Trust, ICANN itself asserts that the GAC is a "constituent body." The exchange between the Panel and counsel for ICANN at the in-person hearing in Washington, D.C. is a living proof of that point.

**HONORABLE JUDGE CAHILL:**

Are you saying we should only look at what the Board does? The reason I'm asking is that your -- the Bylaws say that ICANN and its constituent bodies shall operate, to the maximum extent feasible, in an open and transparent manner. Does the constituent bodies include, I don't know,

GAC or anything? What is "constituent bodies"?

**MR. LEVEE:**

Yeah. What I'll talk to you about tomorrow in closing when I lay out what an IRP Panel is supposed to address, the Bylaws are very clear. Independent Review Proceedings are for the purpose of testing conduct or inaction of the ICANN Board. They don't apply to the GAC. They don't apply to supporting organizations. They don't apply to Staff.

**HONORABLE JUDGE CAHILL:**

So you think that the situation is a -- we shouldn't be looking at what the constituent -- whatever the constituent bodies are, even though that's part of your Bylaws?

**MR. LEVEE:**

Well, when I say not -- when you say not looking, part of DCA's claims that the GAC did something wrong and that ICANN knew that.

**HONORABLE JUDGE CAHILL:**

So is GAC a constituent body?

**MR. LEVEE:**

It is a constituent body, to be clear –

**HONORABLE JUDGE CAHILL:**

Yeah.

**MR. LEVEE:**

-- whether -- I don't think an IRP Panel -- if the only thing that happened here was that the GAC did something wrong --

**HONORABLE JUDGE CAHILL:**

Right.

**MR. LEVEE:**

-- an IRP Panel would not be -- an Independent Review Proceeding is not supposed to address that, whether the GAC did something wrong.

Now, if ICANN knew -- the Board knew that the GAC did something wrong, and that's how they link it, they say, Look, the GAC did something wrong, and ICANN knew it, the Board -- if the Board actually knew it, then we're dealing with Board conduct.

The Board knew that the GAC did not, in fact, issue consensus advice. That's the allegation. So it's fair to look at the GAC's conduct.

42

Exhibit A - Pg 070

101. The Panel is unanimously of the view that the GAC is a constituent body of ICANN. This is not only clear from the above exchange between the Panel and counsel for ICANN, but also from Article XI (Advisory Committees) of ICANN's Bylaws and the Operating Principles of the GAC. Section 1 (General) of Article XI of ICANN's Bylaws states:

> The Board may create one or more Advisory Committees in addition to those set forth in this Article. Advisory Committee membership may consist of Directors only, Directors and non-directors, or non-directors only, and may also include non-voting or alternate members. <u>Advisory Committees shall have no legal authority to act for ICANN (Internet Corporation for Assigned Names and Numbers), but shall report their findings and recommendations to the Board.</u>

Section 2, under the heading, Specific Advisory Committees states:

> There shall be at least the following Advisory Committees:
>
> 1. Governmental Advisory Committee
>
> a. <u>The Governmental Advisory Committee should consider and provide advice on the activities of ICANN (Internet Corporation for Assigned Names and Numbers) as they relate to concerns of governments</u>, particularly matters where there may be an interaction between ICANN (Internet Corporation for Assigned Names and Numbers)'s policies and various laws and international agreements or where they may affect public policy issues. [Underlining is that of the Panel]

Section 6 of the preamble of GAC's Operating Principles is also relevant. That Section reads as follows:

> The GAC commits itself to implement efficient procedures in support of ICANN and to provide thorough and timely advice and analysis on relevant matters of concern with regard to government and public interests.

102. According to DCA Trust, based on the above, and in particular, Article III (Transparency), Section 1 of ICANN's Bylaws, therefore, the GAC was bound to the transparency and fairness obligations of that provision to "operate to the maximum extent feasible in an open and transparent manner and consistent with procedures designed to ensure fairness", but as ICANN's own witness, Ms. Heather Dryden acknowledged during the hearing, the GAC did not act with transparency or in a manner designed to insure fairness.

> **Mr. ALI:**
>
> Q. But what was the purpose of the discussion at the Prague meeting with respect to AUC? If there really is no difference or distinction between voting/nonvoting, observer or whatever might be the opposite of observer,

or the proper terminology, what was -- what was the point?

**THE WITNESS:**

A. I didn't say there was no difference. The issue is that there isn't GAC agreement about what are the -- the rights, if you will, of -- of entities like the AUC. And there might be in some limited circumstances, but it's also an extremely sensitive issue. And so not all countries have a shared view about what those -- those entities, like the AUC, should be able to do.

Q. So not all countries share the same view as to what entities, such as the AUC, should be able to do. Is that what you said? I'm sorry. I didn't --

A. Right, because that would only get clarified if there is a circumstance where that link is forced. In our business, we talk about creative ambiguity. We leave things unclear so we don't have conflict.

103. As explained by ICANN in its Closing Presentation at the hearing, ICANN's witness, Ms. Heather Dryden also asserted that the GAC Advice was meaningless until the Board acted upon it. This last point is also clear from examining Article I, Principle 2 and 5 of ICANN GAC's Operating Principles. Principle 2 states that "the GAC is not a decision making body" and Principle 5 states that "the GAC shall have no legal authority to act for ICANN".

**MR. ALI:**

Q. I would like to know what it is that you, as the GAC Chair, understand to be the consequences of the actions that the GAC will take --

**HONORABLE JUDGE CAHILL:**

The GAC will take?

**MR. ALI:**

Q. -- the GAC will take -- the consequences of the actions taken by the GAC, such as consensus advice?

**HONORABLE JUDGE CAHILL:**

There you go.

**THE WITNESS:**

That isn't my concern as the Chair. It's really for the Board to interpret the outputs coming from the GAC.

104. Ms. Dryden also stated that the GAC made its decision without providing any rationale and primarily based on politics and not on potential violations of national laws and sensitivities.

44

**ARBITRATOR KESSEDJIAN:**

So, basically, you're telling us that the GAC takes a decision to object to an applicant, and no reasons, no rationale, no discussion of the concepts that are in the rules?

**THE WITNESS:**

I'm telling you the GAC did not provide a rationale. And that was not a requirement for issuing a GAC --

**HONORABLE JUDGE CAHILL:**

But you also want to check to see if the countries are following the right -- following the rules, if there are reasons for rejecting this or it falls within the three things that my colleague's talking about.

**THE WITNESS:**

The practice among governments is that governments can express their view, whatever it may be. And so there's a deference to that.

That's certainly the case here as well.

105. ICANN was bound by its Bylaws to conduct adequate diligence to ensure that it was applying its procedures fairly. Section 1 of Article III of ICANN's Bylaws, require it and its constituent bodies to "operate to the maximum extent feasible in an open and transparent manner and consistent with procedures designed to ensure fairness. The Board must also as per Article IV, Section 3, Paragraph 4 exercise due diligence and care in having a reasonable amount of facts in front of it.

106. In this case, on 4 June 2013, the NGPC accepted the GAC Objection Advice to stop processing DCA Trust's application. On 1 August 2013, the BGC recommended to the NGPC that it deny DCA Trust's Request for Reconsideration of the NGPC's 4 June 2013 decision, and on 13 August 2013, the NGPC accepted the BGC's recommendation (i.e., the NGPC declined to reconsider its own decision) without any further consideration.

107. In this case, ICANN through the BGC was bound to conduct a meaningful review of the NGPC's decision. According to ICANN's Bylaws, Article IV, Section 2, the Board has designated the Board Governance Committee to review and consider any such Reconsideration Requests. The [BGC] shall have the authority to, among other things, conduct whatever factual investigation is deemed appropriate, and request additional written submissions from the affected party, or from others.

108. Finally, the NGPC was not bound by – nor was it required to give deference to – the decision of the BGC.

109. The above, combined with the fact that DCA Trust was never given any notice or an opportunity in Beijing or elsewhere to make its position known or defend its own interests before the GAC reached consensus on the GAC Objection Advice, and that the Board of ICANN did not take any steps to address this issue, leads this Panel to conclude that both the actions and inactions of the Board with respect to the application of DCA Trust relating to the .AFRICA gTLD were not procedures designed to insure the fairness required by Article III, Sec. 1 above, and are therefore inconsistent with the Articles of Incorporation and Bylaws of ICANN.

110. The following excerpt of exchanges between the Panel and one of ICANN's witnesses, Ms. Heather Dryden, the then Chair of the GAC, provides a useful background for the decisions reached in this IRP:

>**PRESIDENT BARIN:**
>
>But be specific in this case. Is that what happened in the .AFRICA case?
>
>**THE WITNESS:**
>
>The decision was very quick, and --
>
>**PRESIDENT BARIN:**
>
>But what about the consultations prior? In other words, were -- were you privy to --
>
>**THE WITNESS:**
>
>No. If -- if colleagues are talking among themselves, then that's not something that the GAC, as a whole, is -- is tracking or -- or involved in. It's really those interested countries that are.
>
>**PRESIDENT BARIN:**
>
>Understood. But I assume -- I also heard you say, as the Chair, you never want to be surprised with something that comes up. So you are aware of -- or you were aware of exactly what was happening?
>
>**THE WITNESS:**
>
>No. No. You do want to have a good sense of where the  problems are, what's going to come unresolved back to the full GAC meeting, but that's -- that's the extent of it.

46

And that's the nature of -- of the political process.

**HONORABLE JUDGE CAHILL:**

Were you surprised when Uganda said, I want to keep this on the calendar?

**THE WITNESS:**

No.

**HONORABLE JUDGE CAHILL:**

Because why?

**THE WITNESS:**

It's -- it's -- I didn't have particular expectation –

**HONORABLE JUDGE CAHILL:**

Okay.

**THE WITNESS:**

-- that question was addressed via having that meeting.

**PRESIDENT BARIN:**

And what's your understanding of what -- what the consequence of that decision is or was when you took it? So what happens from that moment on?

**THE WITNESS:**

It's conveyed to the Board, so all the results, the agreed language coming out of GAC is conveyed to the Board, as was the case with the communiqué from the Beijing meeting.

**PRESIDENT BARIN:**

And how is that conveyed to the Board?

**THE WITNESS:**

Well, it's a written document, and usually Support Staff are forwarding it to Board Staff.

**ARBITRATOR KESSEDJIAN:**

Could you speak a little bit louder? I don't know whether I am tired, but I --

**THE WITNESS:**

Okay. So as I was saying, the document is conveyed to the Board once it's concluded.

**PRESIDENT BARIN:**

When you say "the document", are you referring to the communiqué?

**THE WITNESS:**

Yes.

**PRESIDENT BARIN:**

Okay. And there are no other documents?

**THE WITNESS:**

The communiqué --

**PRESIDENT BARIN:**

In relation to .AFRICA. I'm not interested in any other.

**THE WITNESS:**

Yes, it's the communiqué.

**PRESIDENT BARIN:**

And it's prepared by your staff? You look at it?

**THE WITNESS:**

Right --

**PRESIDENT BARIN:**

And then it's sent over to --

**THE WITNESS:**

-- right, it's agreed by the GAC in full, the contents.

**PRESIDENT BARIN:**

And then sent over to the Board?

**THE WITNESS:**

And then sent, yes.

**PRESIDENT BARIN:**

And what happens to that communiqué? Does the Board receive that and say, Ms. Dryden, we have some questions for you on this, or --

**THE WITNESS:**

Not really. If they have questions for clarification, they can certainly ask that in a meeting. But it is for them to receive that and then interpret it and -- and prepare the Board for discussion or decision.

**PRESIDENT BARIN:**

Okay. And in this case, you weren't asked any questions or anything?

**THE WITNESS:**

I don't believe so. I don't recall.

**PRESIDENT BARIN:**

Any follow-ups, right?

**THE WITNESS:**

Right.

**PRESIDENT BARIN:**

And in the subsequent meeting, I guess the issue was tabled. The Board meeting that it was tabled, were you there?

**THE WITNESS:**

Yes. I don't particularly recall the meeting, but yes.

 […]

**ARBITRATOR KESSEDJIAN:**

Can I turn your attention to Paragraph 5 of your declaration?

Here, you basically repeat what is in the ICANN Guidebook literature, whatever. These are the exact words, actually, that you use in your declaration in terms of why there could  be an objection to an applicant -- to a  specific applicant.  And you use three criteria:  problematic, potentially violating  national law, and raise sensitivities.

Now, I'd like you to, for us -- for our benefit, to explain precisely, as  concrete as you can be, what those three  concepts -- how those three concepts  translate in the DCA case. Because this  must have been discussed in order to get  this very quick decision that you are mentioning.  So I'd like to understand, you know,  because these are the criteria -- these  are the three criteria; is that correct?

**THE WITNESS:**

That is what the witness statement says, but the link to the GAC and the role that I played in  terms of the GAC discussion did not  involve me interpreting those three things. In fact, the GAC did not provide rationale for the consensus objection.

**ARBITRATOR KESSEDJIAN:**

No.

But, I mean, look, the GAC is taking a decision which -- very quickly -- I'm using your words, "very quickly" --  erases years and years and years of work,  a lot of effort that have been put by a  single applicant.  And the way I understand the rules  is that the -- the GAC advice --  consensus advice against that applicant  are -- is based on those three criteria. Am I wrong in that analysis?

**THE WITNESS:**

I'm saying that the GAC did not identify a rationale for those governments that put forward a  string or an application for consensus objection. They might have identified  their reasons, but there was not GAC agreement about those reasons or -- or --  or -- or rationale for that.  We had some discussion earlier about  Early Warnings. So Early Warnings were issued by individual countries, and they  indicated their rationale. But, again, that's not a GAC view.

**ARBITRATOR KESSEDJIAN:**

So, basically, you're telling us that the GAC takes a decision to object to an applicant, and no reasons, no rationale, no discussion of the concepts that are in the rules?

**THE WITNESS:**

I'm telling you the  GAC did not provide a rationale. And  that was not a requirement for issuing a  GAC --

**HONORABLE JUDGE CAHILL:**

But you also want to check to see if the  countries are following the right --  following the rules, if there are reasons for rejecting this or it falls within the three things that my colleague's talking about.

**THE WITNESS:**

The practice among  governments is that governments can express their view, whatever it may be.  And so there's […] deference to that.  That's certainly the case here as well.  The -- if a country tells -- tells  the GAC or says it has a concern, that's  not really something that -- that's  evaluated, in the sense you mean, by the other governments. That's not the way governments work with each other.

**HONORABLE JUDGE CAHILL:**

So you don't go into the reasons at all with them?

**THE WITNESS:**

To issue a consensus objection, no.

**HONORABLE JUDGE CAHILL:**

Okay. ---

[…]

**PRESIDENT BARIN:**

I have one question for you. We spent, now, a bit of time or a considerable amount of time talking to you about the process, or the procedure leading to the consensus decision.

Can you tell me what your understanding is of why the GAC consensus objection was made finally?

[…]

But in terms of the .AFRICA, the decision -- the issue came up, the agenda -- the issue came up, and you made a decision, correct?

**THE WITNESS:**

The GAC made a decision.

**PRESIDENT BARIN:**

Right. When I say "you", I mean the GAC.

Do you know -- are you able to express to us what your understanding of the substance behind that decision was? I mean, in other words, we've spent a bit of time dealing with the process.

Can you tell us why the decision happened?

**THE WITNESS:**

The sum of the GAC's advice is reflected in its written advice in the communiqué. That is the view to GAC. That's -- that's --

[…]

**ARBITRATOR KESSEDJIAN:**

I just want to come back to the point that I was making earlier. To your Paragraph 5, you said -- you answered to me saying that is my declaration, but it was not exactly what's going on. Now, we are here to --

51

Exhibit A - Pg 079

at least the  way I understand the Panel's mandate, to  make sure that the rules have been obeyed by, basically. I'm synthesizing.  So I don't understand how, as the  Chair of the GAC, you can tell us that,  basically, the rules do not matter --  again, I'm rephrasing what you said, but  I'd like to give you another opportunity  to explain to us why you are mentioning those criteria in your written  declaration, but, now, you're telling us  this doesn't matter.

If  you want to read  again  what you  wrote,  or supposedly  wrote,  it's  Paragraph 5.

**THE WITNESS:**

I don't need to read again my declaration. Thank you.  The header for the GAC's discussions throughout was to refer to strings or  applications that were controversial or sensitive. That's very broad. And –

**ARBITRATOR KESSEDJIAN:**

I'm sorry. You say the rules say problematic, potentially violate national law, raise sensitivities. These are precise concepts.

**THE WITNESS:**

Problematic, violate national law -- there are a lot of laws -- and sensitivities does strike me as being quite broad.

[…]

**ARBITRATOR KESSEDJIAN:**

Okay. So we are left with what? No rules?

**THE WITNESS:**

No rationale with the consensus objections.

That's the -- the effect.

**ARBITRATOR KESSEDJIAN:**

I'm done.

**HONORABLE JUDGE CAHILL:**

I'm done.

**PRESIDENT BARIN:**

So am I.

111. The Panel understands that the GAC provides advice to the ICANN Board on matters of public policy, especially in cases where ICANN activities and policies may interact with national laws or international agreements. The Panel also understands that GAC advice is developed through consensus among member nations. Finally, the Panel understands that although the ICANN Board is required to consider GAC advice and recommendations, it is not obligated to follow those recommendations.

112. Paragraph IV of ICANN's Beijing, People's Republic of China 11 April 2013 Communiqué [Exhibit C-43] under the heading "GAC Advice to the ICANN Board" states:

> IV.    **GAC Advice to the ICANN Board**
> 1. **New gTLDs**
>    a. **GAC Objections to the Specific Applications**
>       i.    **The GAC Advises the ICANN Board that:**
>
>       i.    The GAC has reached consensus on GAC Objection Advice according to Module 3.1 part I of the Applicant Guidebook on the following applications:
>
>             1.    The application for .africa (Application number 1-1165-42560)
>
>             [...]

Footnote 3 to Paragraph IV.1. (a)(i)(i) above in the original text adds, "Module 3.1: The GAC advises ICANN that it is the consensus of the GAC that a particular application should not proceed. This will create a strong presumption for the ICANN Board that the application should not be approved." A similar statement in this regard can be found in paragraph 5 of Ms. Dryden's 7 February 2014 witness statement.

113. In light of the clear "Transparency" obligation provisions found in ICANN's Bylaws, the Panel would have expected the ICANN Board to, at a minimum, investigate the matter further before rejecting DCA Trust's application.

114. The Panel would have had a similar expectation with respect to the NGPC Response to the GAC Advice regarding .AFRICA which was expressed in ANNEX 1 to NGPC Resolution No. 2013.06.04.NG01 [Exhibit C-45]. In that document, in response to DCA Trust's application, the NGPC stipulated:

53

The NGPC accepts this advice. The AGB provides that "if GAC advised ICANN that it is the consensus of the GAC that a particular application should not proceed. This will create a strong presumption for the ICANN Board that the application should not be approved. The NGPC directs staff that pursuant to the GAC advice and Section 3.1 of the Applicant Guidebook, Application number 1-1165-42560 for .africa will not be approved. In accordance with the AGB the applicant may with draw […] or seek relief according to ICANN's accountability mechanisms (see ICANN's Bylaws, Articles IV and V) subject to the appropriate standing and procedural requirements.

115. Based on the foregoing, after having carefully reviewed the Parties' written submissions, listened to the testimony of the three witness, listened to the oral submissions of the Parties in various telephone conference calls and at the in-person hearing of this IRP in Washington, D.C. on 22 and 23 May 2015, and finally after much deliberation, pursuant to Article IV, Section 3, paragraph 11 (c) of ICANN's Bylaws, the Panel declares that both the actions and inactions of the Board with respect to the application of DCA Trust relating to the .AFRICA gTLD were inconsistent with the Articles of Incorporation and Bylaws of ICANN.

116. As indicated above, there are perhaps a number of other instances, including certain decisions made by ICANN, that did not proceed in the manner and spirit in which they should have under the Articles of Incorporation and Bylaws of ICANN.

117. DCA Trust has criticized ICANN for its various actions and decisions throughout this IRP and ICANN has responded to each of these criticisms in detail. However, the Panel, having carefully considered these criticisms and decided that the above is dispositive of this IRP, it does not find it necessary to determine who was right, to what extent and for what reasons in respect to the other criticisms and other alleged shortcomings of the ICANN Board identified by DCA Trust.

**2) Can the IRP Panel recommend a course of action for the Board to follow as a consequence of any declaration that the Board acted or failed to act in a manner inconsistent with ICANN's Articles of Incorporation, Bylaws or the Applicant Guidebook?**

118. In the conclusion of its Memorial on the Merits filed with the Panel on 3 November 2014, DCA Trust submitted that ICANN should remove ZACR's application from the process altogether and allow DCA's application to proceed under the rules of the New gTLD Program, allowing DCA up to 18 months to negotiate with African governments

54

to obtain the necessary endorsements so as to enable the delegation and management of the .AFRICA string.

119. In its Final Request for Relief filed with the Panel on 23 May 2015, DCA Trust requested that this Panel recommend to the ICANN Board that it cease all preparations to delegate the .AFRICA gTLD to ZACR and recommend that ICANN permit DCA's application to proceed through the remainder of the new gTLD application process and be granted a period of no less than 18 months to obtain Government support as set out in the AGB and interpreted by the Geographic Names Panel, or accept that the requirement is satisfied as a result of the endorsement of DCA Trust's application by UNECA.

120. DCA Trust also requested that this Panel recommend to ICANN that it compensate DCA Trust for the costs it has incurred as a result of ICANN's violations of its Articles of Incorporation, Bylaws and AGB.

121. In its response to DCA Trust's request for the recommendations set out in DCA Trust's Memorial on the Merits, ICANN submitted that this Panel does not have the authority to grant the affirmative relief that DCA Trust had requested.

122. According to ICANN:

> 48. DCA's request should be denied in its entirety, including its request for relief. DCA requests that this IRP Panel issue a declaration requiring ICANN to "rescind its contract with ZACR" and to "permit DCA's application to proceed through the remainder of the application process." Acknowledging that it currently lacks the requisite governmental support for its application, DCA also requests that it receive "18 months to negotiate with African governments to obtain the necessary endorsements." In sum, DCA requests not only that this Panel remove DCA's rival for .AFRICA from contention (requiring ICANN to repudiate its contract with ZACR), but also that it rewrite the Guidebook's rules in DCA's favor.

> 49. IRP Panels do not have authority to award affirmative relief. Rather, an IRP Panel is limited to stating its opinion as to "whether an action or inaction of the Board was inconsistent with the Articles of Incorporation or Bylaws" and recommending (as this IRP Panel has done previously) that the Board stay any action or decision, or take any interim action until such time as the Board reviews and acts upon the opinion of the IRP Panel. The Board will, of course, give extremely serious consideration to the Panel's recommendations.

123. In its response to DCA Trust's amended request for recommendations filed on 23 May 2015, ICANN argued that because the Panel's authority is limited to declaring whether the Board's conduct was inconsistent with the Articles or the Bylaws, the Panel should limit its declaration to that question and refrain from

recommending how the Board should then proceed in light of the Panel's declaration.

124. In response, DCA Trust submitted that according to ICANN's Bylaws, the Independent Review Process is designed to provide a remedy for "any" person materially affected by a decision or action by the Board. Further, "in order to be materially affected, the person must suffer injury or harm that is directly and causally connected to the Board's alleged violation of the Bylaws or the Articles of Incorporation.

125. According to ICANN, "indeed, the ICANN New gTLD Program Committee, operating under the delegated authority of the ICANN Board, itself [suggests] that DCA could seek relief through ICANN's accountability mechanisms or, in other words, the Reconsideration process and the Independent Review Process." Furthermore:

> If the IRP mechanism – the mechanism of last resort for gTLD applicants – is intended to provide a remedy for a claimant materially injured or harmed by Board action or inaction, and it serves as the only alternative to litigation, then naturally the IRP Panel may recommend how the ICANN Board might fashion a remedy to redress such injury or harm.

126. After considering the Parties' respective submissions in this regard, the Panel is of the view that it does have the power to recommend a course of action for the Board to follow as a consequence of any declaration that the Board acted or failed to act in a manner inconsistent with ICANN's Articles of Incorporation, Bylaws or the Applicant Guidebook.

127. Article IV, Section 3, paragraph 11 (d) of ICANN's Bylaws states:

> **ARTICLE IV: ACCOUNTABILITY AND REVIEW**
> **Section 3. INDEPENDENT REVIEW OF BOARD ACTIONS**
>
> 11.     The IRP Panel shall have the authority to:
>
> > d. recommend that the Board stay any action or decision or that the Board take any interim action, until such time as the Board reviews and acts upon the opinion of the IRP.

128. The Panel finds that both the language and spirit of the above section gives it authority to recommend how the ICANN Board might fashion a remedy to redress injury or harm that is directly related and causally connected to the Board's violation of the Bylaws or the Articles of Incorporation.

129. As DCA Trust correctly points out, with which statement the Panel agrees, "if the IRP mechanism – the mechanism of last resort for

56

gTLD applicants – is intended to provide a remedy for a claimant materially injured or harmed by Board action or inaction, <u>and it serves as the only alternative to litigation</u>, then naturally the IRP Panel may recommend how the ICANN Board might fashion a remedy to redress such injury or harm."

130. Use of the imperative language in Article IV, Section 3, paragraph 11 (d) of ICANN's Bylaws, is clearly supportive of this point. That provision clearly states that the IRP Panel has the authority to recommend a course of action until such time as the Board considers the opinion of the IRP and acts upon it.

131. Furthermore, use of the word "opinion", which means the formal statement by a judicial authority, court, arbitrator or "Panel" of the reasoning and the principles of law used in reaching a decision of a case, is demonstrative of the point that the Panel has the authority to recommend affirmative relief. Otherwise, like in section 7 of the Supplementary Procedures, the last sentence in paragraph 11 would have simply referred to the "declaration of the IRP". Section 7 under the heading "Interim Measures of Protection" says in part, that an "IRP PANEL may recommend that the Board stay any action or decision, or that the Board take any interim action, until such time as the Board reviews and acts upon the IRP declaration."

132. The scope of Article IV, Section 3, paragraph 11 (d) of ICANN's Bylaws is clearly broader than Section 7 of the Supplementary Procedures.

133. Pursuant to Article IV, Section 3, paragraph 11 (d) of ICANN's Bylaws, therefore, the Panel recommends that ICANN continue to refrain from delegating the .AFRICA gTLD and permit DCA Trust's application to proceed through the remainder of the new gTLD application process.

**3) Who is the prevailing party in this IRP?**

134. In its letter of 1 July 2015, ICANN submits that, "ICANN believes that the Panel should and will determine that ICANN is the prevailing party. Even so, ICANN does not seek in this instance the putative effect that would result if DCA were required to reimburse ICANN for all of the costs that ICANN incurred. This IRP was much longer [than] anticipated (in part due to the passing of one of the panelists last summer), and the Panelists' fees were far greater than an ordinary IRP, particularly because the Panel elected to conduct a live hearing."

57

Exhibit A - Pg 085

135. DCA Trust on the other hand, submits that, "should it prevail in this IRP, ICANN should be responsible for all of the costs of this IRP, including the interim measures proceeding." In particular, DCA Trust writes:

> On March 23, 2014, DCA learned via email from a supporter of ZA Central Registry ("ZACR"), DCA's competitor for .AFRICA, that ZACR would sign a registry agreement with ICANN in three days' time (March 26) to be the registry operator for .AFRICA. The very same day, we sent a letter on behalf of DCA to ICANN's counsel asking ICANN to refrain from executing the registry agreement with ZACR in light of the pending IRP proceedings. *See* DCA's Request for Emergency Arbitrator and Interim Measures of Protection, Annex I (28 Mar. 2014). Instead, ICANN entered into the registry agreement with ZACR the very next day—two days ahead of schedule. [...] Later that same day, ICANN responded to DCA's request by treating the execution of the contract as a *fait accompli* and, for the first time, informed DCA that it would accept the application of Rule 37 of the 2010 [ICDR Rules], which provides for emergency measures of protection, even though ICANN's Supplementary Procedures for ICANN Independent Review Process expressly provide that Rule 37 does not apply to IRPs. A few days later, on March 28, 2014, DCA filed a Request for Emergency Arbitrator and Interim Measures of Protection with the ICDR. ICANN responded to DCA's request on April 4, 2014. An emergency arbitrator was appointed by the ICDR; however, the following week, the original panel was fully constituted and the parties' respective submissions were submitted to the Panel for its review on April 13, 2014. After a teleconference with the parties on April 22 and a telephonic hearing on May 5, the Panel ruled that "ICANN must immediately refrain from any further processing of any application for .AFRICA" during the pendency of the IRP. Decision on Interim Measures of Protection, ¶ 51 (12 May 2014).

136. A review of the various procedural orders, decisions, and declarations in this IRP clearly indicates that DCA Trust prevailed in many of the questions and issues raised.

137. In its letter of 1 July 2015, DCA Trust refers to several instances in which ICANN was not successful in its position before this Panel. According to DCA Trust, the following are some examples, "ICANN's Request for Partial Reconsideration, ICANN's request for the Panel to rehear the proceedings, and the evidentiary treatment of ICANN's written witness testimony in the event it refused to make its witnesses available for questioning during the merits hearing."

138. The Panel has no doubt, as ICANN writes in its letter of 1 July 2015, that the Parties' respective positions in this IRP "were asserted in good faith." According to ICANN, "although those positions were in many instances diametrically opposed, ICANN does not doubt that DCA believed in the credibility of the positions that it took, and

[ICANN believes] that DCA feels the same about the positions ICANN took."

139. The above said, after reading the Parties' written submissions concerning the issue of costs and deliberation, the Panel is unanimously of the view that DCA Trust is the prevailing party in this IRP.

## 4) Who is responsible for bearing the costs of this IRP and the cost of the IRP Provider?

140. DCA Trust submits that ICANN should be responsible for *all* costs of this IRP, including the interim measures proceeding. Among other arguments, DCA Trust submits:

> This is consistent with ICANN's Bylaws and Supplementary Procedures, which together provide that in ordinary circumstances, the party not prevailing shall be responsible for all costs of the proceeding. Although ICANN's Supplementary Procedures do not explain what is meant by "all costs of the proceeding," the ICDR Rules that apply to this IRP provide that "costs" include the following:
>
> > (a) the fees and expenses of the arbitrators;
> >
> > (b) the costs of assistance required by the tribunal, including its experts;
> >
> > (c) the fees and expenses of the administrator;
> >
> > (d) the reasonable costs for legal representation of a successful party; and
> >
> > (e) any such costs incurred in connection with an application for interim or emergency relief pursuant to Article 21.
>
> Specifically, these costs include all of the fees and expenses paid and owed to the [ICDR], including the filing fees DCA paid to the ICDR (totaling $4,750), all panelist fees and expenses, including for the emergency arbitrator, incurred between the inception of this IRP and its final resolution, legal costs incurred in the course of the IRP, and all expenses related to conducting the merits hearing (*e.g.*, renting the audiovisual equipment for the hearing, printing hearing materials, shipping hard copies of the exhibits to the members of the Panel).
>
> Although in "extraordinary" circumstances, the Panel may allocate up to half of the costs to the prevailing party, DCA submits that the circumstances of this IRP do not warrant allocating costs to DCA should it prevail. The reasonableness of DCA's positions, as well as the meaningful contribution this IRP has made to the public dialogue about both ICANN's accountability mechanisms and the appropriate deference owed by ICANN to its Governmental Advisory Committee, support a full award of costs to

DCA.

[...]

To the best of DCA's knowledge, this IRP was the first to be commenced against ICANN under the new rules, and as a result there was little guidance as to how these proceedings should be conducted. Indeed, at the very outset there was controversy about the applicable version of the Supplemental Rules as well as the form to be filed to initiate a proceeding. From the very outset, ICANN adopted positions on a variety of procedural issues that have increased the costs of these proceedings. In DCA's respectful submission, ICANN's positions throughout these proceedings are inconsistent with ICANN's obligations of transparency and the overall objectives of the IRP process, which is the only independent accountability mechanism available to parties such as DCA.

141. DCA Trust also submits that ICANN's conduct in this IRP increased the duration and expense of this IRP. For example, ICANN failed to appoint a standing panel, it entered into a registry agreement with DCA's competitor for .AFRICA during the pendency of this IRP, thereby forcing DCA Trust to request for interim measures of protection in order to preserve its right to a meaningful remedy, ICANN attempted to appeal declarations of the Panel on procedural matters where no appeal mechanism was provided for under the applicable procedures and rules, and finally, ICANN refused only a couple of months prior to the merits hearing, to make its witnesses available for viva voce questioning at the hearing.

142. ICANN in response submits that, "both the Bylaws and the Supplementary Procedures provide that, in the ordinary course, costs shall be allocated to the prevailing party. These costs include the Panel's fees and the ICDR's fees, [they] would also include the costs of the transcript."

143. ICANN explains on the other hand that this case was extraordinary and this Panel should exercise its discretion to have each side bear its own costs as this IRP "was in many senses a first of its kind." According to ICANN, among other things:

This IRP was the first associated with the Board's acceptance of GAC advice that resulted in the blocking of an application for a new gTLD under the new gTLD Program;

This was the first IRP associated with a claim that one or more ICANN Board members had a conflict of interest with a Board vote; and

This was the first (and still only) IRP related to the New gTLD Program that involved a live hearing, with a considerable amount of debate associated with whether to have a hearing.

60

144. After reading the Parties' written submissions concerning the issue of costs and their allocation, and deliberation, the Panel is unanimous in deciding that DCA Trust is the prevailing party in this IRP and ICANN shall bear, pursuant to Article IV, Section 3, paragraph 18 of the Bylaws, Article 11 of Supplementary Procedures and Article 31 of the ICDR Rules, the totality of the costs of this IRP and the totality of the costs of the IRP Provider.

145. As per the last sentence of Article IV, Section 3, paragraph 18 of the Bylaws, however, DCA Trust and ICANN shall each bear their own expenses, and they shall also each bear their own legal representation fees.

146. For the avoidance of any doubt therefore, the Panel concludes that ICANN shall be responsible for paying the following costs and expenses:

    a) the fees and expenses of the panelists;
    b) the fees and expenses of the administrator, the ICDR;
    c) the fees and expenses of the emergency panelist incurred in connection with the application for interim emergency relief sought pursuant to the Supplementary Procedures and the ICDR Rules; and
    d) the fees and expenses of the reporter associated with the hearing on 22 and 23 May 2015 in Washington, D.C.

147. The above amounts are easily quantifiable and the Parties are invited to cooperate with one another and the ICDR to deal with this part of this Final Declaration.

## V.     DECLARATION OF THE PANEL

148. Based on the foregoing, after having carefully reviewed the Parties' written submissions, listened to the testimony of the three witness, listened to the oral submissions of the Parties in various telephone conference calls and at the in-person hearing of this IRP in Washington, D.C. on 22 and 23 May 2015, and finally after much deliberation, pursuant to Article IV, Section 3, paragraph 11 (c) of ICANN's Bylaws, the Panel declares that both the actions and inactions of the Board with respect to the application of DCA Trust relating to the .AFRICA gTLD were inconsistent with the Articles of Incorporation and Bylaws of ICANN.

149. Furthermore, pursuant to Article IV, Section 3, paragraph 11 (d) of ICANN's Bylaws, the Panel recommends that ICANN continue to

Exhibit A - Pg 089

refrain from delegating the .AFRICA gTLD and permit DCA Trust's application to proceed through the remainder of the new gTLD application process.

150. The Panel declares DCA Trust to be the prevailing party in this IRP and further declares that ICANN is to bear, pursuant to Article IV, Section 3, paragraph 18 of the Bylaws, Article 11 of Supplementary Procedures and Article 31 of the ICDR Rules, the totality of the costs of this IRP and the totality of the costs of the IRP Provider as follows:

   a) the fees and expenses of the panelists;
   b) the fees and expenses of the administrator, the ICDR;
   c) the fees and expenses of the emergency panelist incurred in connection with the application for interim emergency relief sought pursuant to the Supplementary Procedures and the ICDR Rules; and
   d) the fees and expenses of the reporter associated with the hearing on 22 and 23 May 2015 in Washington, D.C.
   e) As a result of the above, the administrative fees of the ICDR totaling US$4,600 and the Panelists' compensation and expenses totaling US$403,467.08 shall be born entirely by ICANN, therefore, ICANN shall reimburse DCA Trust the sum of US$198,046.04

151. As per the last sentence of Article IV, Section 3, paragraph 18 of the Bylaws, DCA Trust and ICANN shall each bear their own expenses. The Parties shall also each bear their own legal representation fees.

62

Exhibit A - Pg 090

The Panel finally would like to take this opportunity to fondly remember its collaboration with the Hon. Richard C. Neal (Ret. and now Deceased) and to congratulate both Parties' legal teams for their hard work, civility and responsiveness during the entire proceedings. The Panel was extremely impressed with the quality of the written work presented to it and oral advocacy skills of the Parties' legal representatives.

**This Final Declaration has sixty-three (63) pages.**

**Date: Thursday, 9 July 2015.**

**Place of the IRP, Los Angeles, California.**

Professor Catherine Kessedjian

Hon. William J. Cahill (Ret.)

Babak Barin, President

63