Ethan J. Brown (SBN 218814)
 *ethan@bnslawgroup.com*
Sara C. Colón (SBN 281514)
 *sara@bnslawgroup.com*
**BROWN NERI & SMITH LLP**
11766 Wilshire Boulevard, Suite 1670
Los Angeles, California 90025
Telephone:  (310) 593-9890
Facsimile:  (310) 593-9980

*Attorneys for Plaintiff*
DOTCONNECTAFRICA TRUST

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| DOTCONNECTAFRICA TRUST, a Mauritius Charitable Trust;<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California corporation; ZA Central Registry, a South African non-profit company; and DOES 1 through 50, inclusive;<br><br>　　　　Defendants. | Case No. 2:16-cv-00862-RGK (JCx)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS' MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:　　　　April 25, 2016<br>Hearing:　　9:00 a.m.<br>Courtroom:  850<br><br>[Filed concurrently: Request for Judicial Notice] |

OPPOSITION TO ICANN'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

I.   **INTRODUCTION** ...................................................................... 1

II.  **FACTS** ............................................................................................. 2

    A. **ICANN and its public duty.** ........................................... 2

    B. **DCA and the .Africa gTLD.** ........................................... 3

    C. **The AUC's improper application through ZACR.** .............. 4

    D. **ICANN Geographic Names Panel and InterConnect Communication.** ................................................................ 5

    E. **The Governmental Advisory Committee.** ........................ 6

    F. **The Independent Review Process.** .................................. 7

    G. **ICANN's Processing of DCA's Application After the IRP Ruling.** ..... 8

III. **LEGAL STANDARD** .................................................................. 9

IV.  **ARGUMENT** .............................................................................. 9

    A. **ICANN's Prospective Release is void.** ........................... 9

        1. The Prospective Release violates California Civil Code §1668. ..... 9

        2. The IRP does not validate the Prospective Release. ........... 11

        3. The release is void regardless of DCA's claims. ................ 12

        4. The release is unconscionable as DCA could not negotiate it and it only prohibits DCA from bringing claims in a court of law. ...... 13

        5. The Prospective Release was procured by fraud. ............... 15

    B. **ICANN's discretion in reviewing applications is not a bar to DCA's breach of contract claim.** ........................ 16

    C. **DCA has pleaded fraud with specificity.** ........................ 18

    D. **At the very least, leave to amend should be granted.** ...... 20

V.   **CONCLUSION** ........................................................................ 20

# TABLE OF AUTHORITIES

**CASES**

*Armendariz v. Foundation Health Pyschcare Services, Inc.*,
24 Cal.4th 83 (2000) ................................................................. 13

*Baker Pacific Corp v. Suttles*, 220 Cal.App.3d 1148 (1990)................................ 10

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)...................................................... 8

*Broam v. Brogan*, 320 F.3d 1023 (9th Cir. 2003)............................................ 8, 18

*Commercial Connect v. Internet Corp. for Assigned Names and Numbers*,
No. 3:16-cv-00012-JHM, 2016 U.S. Dist. LEXIS 8550
(W.D. Ky. Jan. 26, 2016)............................................................. 10

*Chastain v. Belmont*, 43 Cal.2d 45 (1954) .................................................... 17

*City of Santa Barbara v. Sup. Court*, 41 Cal.4th 747 (2007) ...................... 11, n.3

*Garcia v. Stonehenge, Ltd.*, No. C-97-4368-VRW,
1998 U.S. Dist. LEXIS 23565(N.D. Cal. Mar. 2, 1998) ............................ 17

*Health Net of California v. Department of Health Services*,
113 Cal.App.4th 224 (2003) .......................................................... 11

*Intri-Plex Technologies, Inc. v. Crest Group, Inc.*,
499 F.3d 1048 (9th Cir. 2007) ......................................................... 9

*Image Online Design, Inc. v. Internet Corp. for Assigned Names and Numbers*,
No. CV 12-08968-DDP (JCx), 2013 U.S. Dist. LEXIS 16896
(C.D. Cal. Feb. 7, 2013) ............................................................... 17

*Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257 (9th Cir. 2006) ............................ 15

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015)................. 20

*Oceanside 84, Ltd. V. Fidelity Federal Bank*, 56 Cal.App.4th 1441 (1997)......... 17

*Paralift, Inc. v. Superior Court*, 23 Cal.App.4th 748 (1993) ...................... 12, n.5

*Pedersen v. Greenpoint Mortg. Funding, Inc.*,
No. 2:11-cv-00642-KJM-EFB, 2013 U.S. Dist. LEXIS 109111
(E.D. Cal. Aug. 1, 2013).............................................................. 20

*Prakash v. Pulsent Corp. Emple. Long Term Disability Plan*,
 No. C-06-7592 SC, 2008 U.S. Dist. LEXIS 120366
 (N.D. Cal. Aug. 20, 2008) ................................................................ 18, 19

*Reudy v. Clear Channel Outdoors, Inc.*,
 693 F.Supp.2d 1091 (N.D. Cal. 2007)................................................ 10, 11, 12

*Tunkl v. Regents of University of Cal.*, 60 Cal.2d 92 (1963)........................... 10, n.2

*Sanchez v. Bally's Total Fitness Corp*, 68 Cal.App.4th 62 (1998)................. 11, n.3

*Skrbina v. Fleming Cos.,* 45 Cal.App.4th 1353 (1996) ......................................... 12

*Strom v. United States*, 641 F.3d 1051 (9th Cir. 2011) ......................................... 8

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ...................................................... 13

*Ulene v. Jacobson*, 209 Cal.App.2d 139 (1962) ................................................... 12

*Woodside Homes of Cal. v. Sup. Court*, 107 Cal.App.4th 723 (2003) ................. 13

**STATUTES**

Fed. R. Civ. P. 15(a)(2) ........................................................................................ 20

Cal. Civ. Code §1599 ............................................................................................ 12

Cal. Civ. Code §1641 ............................................................................................ 16

Cal. Civ. Code §1654 ............................................................................................ 17

Cal. Civ. Code §1668 ......................................................................................... 9, 11

TABLE OF AUTHORITIES
iii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Now for the third time Defendant the Internet Corporation for Assigned Names and Numbers ("ICANN") makes the identical cut-and-paste argument relying on the prospective release and covenant not to sue (the "Prospective Release") it forces applicants for generic top level domain ("gTLDs") to sign as a condition of their application to attempt to avoid scrutiny for its wrongful acts.  This Court already implicitly rejected the argument that this Prospective Release was enforceable as a matter of law in ruling that Plaintiff Dotconnectafrica Trust ("DCA") had raised "serious questions" going to the merits in granting DCA's application for a temporary restraining order ("TRO").

ICANN's argument based on the Prospective Release founders upon California Civil Code § 1668.  The Prospective Release is also unconscionable and procured by fraud – allegations that, at a bare minimum, permit DCA discovery to support them. The single district court case from Kentucky on which ICANN pins its hopes is inapposite because plaintiff there lacked counsel and made none of the relevant arguments to defeat the Prospective Release.

Second, ICANN argues that DCA's breach of contract claim fails– regardless of ICANN's actions or the representations in the Guidebook about how it processes gTLD applications – because ICANN claims it had the unbridled discretion to do as it pleased with DCA's .Africa gTLD application.  But no gTLD applicant would expect that this "discretion" could include biased, arbitrary, and unfair treatment, after submitting an $185,000 application fee to ICANN.  After all, ICANN repetitively assures that it will act with transparency, fairness, and integrity without discriminating or applying its standards, policies, or practices inequitably or in a disparate manner.  RJN, Ex. 1, p. 7, ¶¶ 7 and 8 [Article I, Section 2, ¶¶ 7 and 8]; p. 8 [Article II, Section 3]; p. 8 [Article III, Section 1].  Those policies are the framework of ICANN, and as to parties applying for various TLDs, are promises to

evaluate applications within that framework. Even if ICANN has the discretion to deny an application, ICANN must still comply with provisions of the Guidebook, its Bylaws, and Articles of Incorporation. Throughout its FAC, DCA has alleged repeated breaches of those provisions and ICANN's own Independent Review Process (IRP) panel already found such violations here. At a minimum, DCA has stated a claim for which it is entitled to discovery.

Finally, DCA properly alleged fraud with specificity. DCA alleged that ICANN made various false representations through its Guidebook, Bylaws, and Articles of Incorporation. DCA alleged the following misrepresentations: ICANN afforded applicants with due process through theIRP; ICANN reviewed applications according to the Guidebook, Bylaws, and Articles of Incorporation; ICANN would participate in the IRP in good faith; and all gTLD applicants receive the same treatment according to the Guidebook, Bylaws, and Articles of Incorporation. DCA also alleged ICANN's fraudulent actions in processing ZACR's application.

## II.   **FACTS**

### A. **ICANN and its public duty.**

ICANN was established and authorized in 1998 for the purpose of regulating and assigning rights to internet domains in the Domain Name System ("DNS"). (First Amended Complaint ("FAC") ¶12.) Based on the public nature of the internet, ICANN was tasked with carrying out its duties in conformity with relevant principles of California law, international law, international conventions, and through open and transparent processes enabling competition and open-entry in Internet-related markets. (*Id.* ¶12.) ICANN is the sole organization in the world assigning rights to Generic Top-Level Domains ("gTLDs") – *i.e.* ".com," ".org," or ".Africa." (*Id.* ¶13.) As the sole organization, ICANN imposes its standards on applicants.

The following core principles guide the decisions and actions of ICANN: (a) Preserve and enhance the operational stability, reliability, security, and global interoperability of the Internet; (b) Employ open and transparent policy development

mechanisms that promote well-informed decisions based on expert advice and ensure that those entities most affected can assist in the policy development process; (c) Make decisions by applying documented policies neutrally and objectively with integrity and fairness; and (d) Remain accountable to the Internet community through mechanisms that enhance ICANN's effectiveness.  (*Id.* ¶15.)  ICANN's Bylaws also state that it shall not apply its standards, policies, or practices inequitably or single out any particular party for disparate treatment.  (*Id.* ¶16.)

### B. <u>DCA and the .Africa gTLD.</u>

In or about 2011, ICANN approved the expansion of the number of gTLDs available to eligible applicants as part of its 2012 Generic Top-Level Domain Internet Expansion Program.  (*Id.* ¶18.)

Parties, such as DCA, were invited to submit applications to obtain the rights to operate various new gTLDs, including but not limited to, .Lat (Latin America), .Wales, .Africa, and .Swiss.  (*Id.*  ¶19.)  ICANN promised, and applicants expected ICANN to conduct application processing in the transparent and fair-handed manner promoted in ICANN's Bylaws and rules set forth in the gTLD Applicant Guidebook (the "Guidebook").  (*Id.* ¶20.)  DCA submitted an application for the gTLD .Africa and the required $185,000 fee.  (*Id.* ¶¶21-22.)

According to the Guidebook, .Africa (a geographic gTLD) would be evaluated by a Geographic Names Evaluation Panel.  (*Id.* ¶23.) The evaluation criteria is stipulated in Section 2.2.1.4.2 of the Guidebook.  (*Id.*)  ICANN requires geographic name gTLD applicants to (1) obtain endorsements from 60% of the national governments in the region, and (2) have no more than one written statement of objection to the application from relevant governments and/or public authorities associated with the region.  (*Id.*)

As part of its bid to apply for the delegation rights of the .Africa gTLD, Plaintiff obtained the endorsements of the African Union Commission (hereinafter the "AUC") in August 2009 and the United Nations Economic Commission for

Africa (hereinafter the "UNECA") in August 2008.  (*Id.* ¶24.)  Plaintiff was the first to request and obtain official support for. Africa from these organizations.  (*Id.*)  In April 2010, nearly a year later, AUC wrote DCA and informed DCA that it had "reconsidered its approach in implementing the subject Internet Domain Name (.Africa) and no longer endorses individual initiatives in this matter related to continental resource."  (*Id.*)  However, the letter did not withdraw its endorsement of DCA.  (*Id.*)  Furthermore, Guidebook Section 2.2.1.4.3 states that a government may only withdraw its endorsement "*if the registry operator has deviated from the conditions of original support or non-objection.*" (Emphasis added).  (*Id.* ¶ 25.) There were no conditions on the AUC or UNECA endorsements to DCA.  (*Id.*)

## C. **The AUC's improper application through ZACR.**

Instead of functioning as a disinterested regulator of a fair and transparent gTLD application process, ICANN used its authority and oversight over that process to unfairly assist ZACR and to wrongfully eliminate the only other applicant, Plaintiff, from the process to the great detriment of Plaintiff (*Id.* ¶3). AUC itself attempted in 2011 in Dakar, Senegal, to obtain the rights to .Africa by requesting from ICANN to include .Africa in the List of Top-Level Reserved Names. This would mean that the .Africa name and its equivalent in other languages would be unavailable for delegation under the ICANN new gTLD Program, which would enable the AUC benefit from a special legislative protection that would allow the AUC to delegate .Africa new gTLD itself.  (*Id.* ¶26). When ICANN denied AUC's request to reserve .Africa at the immediate insistence of DCA and in compliance with the gTLD guidebook rules, the AUC and ZACR conspired to improperly obtain the rights to .Africa through a third-party company, Uniforum ZA Central Registry (ZACR) for their own benefit, in violation of the new gTLD program guidelines. (*Id.* ¶27). ZACR wrongfully campaigned against DCA's application both to ICANN and the AUC. ZACR also represented to AUC that DCA should not have AUC's endorsement because it was not a community organization, even though an

application by an individual organization is perfectly acceptable under ICANN's rules. ZACR also invited the ICANN Independent Objector ("IO") to object to DCA even though DCA was not subject to the IO's review because DCA's application was not a community application. (*Id.* ¶28).  ICANN then breached its agreement with Plaintiff to review Plaintiff's .Africa application in accordance with its Bylaws, Articles of Incorporation, and the new gTLD rules and procedures by improperly advising and conspiring with the AUC on how to defeat any applications for .Africa other than its own (via its improper proxy, ZACR). (*Id.* ¶29). ICANN never had any intention of treating applicants the same or making them follow the same rules. Instead, ICANN simply chose applicants based on its own wishes and in exchange for political favors. (*Id.* ¶76).

ZACR's application was flawed from the start. ZACR submitted its application on behalf of the African "community." (*Id.* ¶31.)  Therefore, it was required to submit a specific application designed for organizations applying on behalf of a community. (*Id.*)  ZACR instead submitted a standard – not community -- application. (*Id.*) ZACR also falsely represented that it had sufficient endorsements from the relevant governments and the financial capability to operate .Africa. (*Id.* ¶32.)

### D. <u>ICANN Geographic Names Panel and InterConnect Communication.</u>

For each application, ICANN's Geographic Names Panel ("GNP") determines which governments are relevant based on the inputs of the applicant, governments, and its own research and analysis. (*Id.* ¶35.)  Thus, the GNP determines the validity of gTLD applicant's endorsements. (*Id.* ¶33.)  InterConnect Communication ("ICC") contracted with ICANN to perform string similarity and geographic review for the initial stage of gTLD application processing. (*Id.* ¶34.)

ICC indicated to ICANN that if endorsements from the AUC and UNECA were not accepted under ICANN's standards, then neither DCA nor ZACR had

sufficient endorsements.  (*Id.* ¶35.)  ICC emphasized that the criteria established for accepting the AUC as a valid endorsement, necessarily required acceptance of UNECA's endorsement.  (*Id.* ¶37.)  ICANN accepted the AUC's endorsement, but refused to accept UNECA's endorsement.  (*Id.* ¶38.)  If ICANN accepted both endorsements, ICANN had no grounds to deny DCA's application.  (*Id.* ¶39.)

ICANN was also required to inform DCA of any problems with endorsements. (*Id.* ¶40.)  Although ZACR's application was placed ahead of DCA's by virtue of a lottery-based selection, ICANN delayed processing ZACR's application.  (*Id.*)  ZACR would have failed the initial evaluation stage, but ICANN provided ZACR with additional time to obtain further endorsements.  (*Id.*)  According to the Guidebook, evaluation panels are required to act impartially and transparently.  This was not the case here.  (*Id.* ¶41.)

### E. <u>The Governmental Advisory Committee.</u>

ICANN also has a Governmental Advisory Committee ("GAC") whose purpose is to "consider and provide advice on the activities of ICANN as they relate to concerns of governments." (*Id.* ¶42.) GAC membership is open to representatives of all national governments, and at the GAC Chair's invitation, to "[e]conomies as recognized in the international fora, and multinational governmental organizations and treaty organizations.  (*Id.*)

On the apparent advice of ICANN, the AUC became a member of the GAC in June 2012.  (*Id.* ¶43.)  The AUC has no voting authority, like the EU, because it has no regulatory authority over its member states.  (*Id.*)  But ICANN allowed the AUC to offer advice on behalf of ZACR, and against ZACR's competitor DCA, against DCA's .Africa Application.  (*Id.* ¶44.)  ICANN allowed the GAC to issue "consensus advice" to deny DCA's Application from advancing. (*Id.*)   Under ICANN rules, the GAC can only recommend ceasing review of an application if *all* GAC members agree; Kenya's representative did not agree.  (*Id.* ¶¶44-45.) Instead, Kenya's *former* GAC advisor, Alice Munyua – a *representative for the AUC* –

purportedly made a statement on behalf of Kenya denouncing DCA's Application. (*Id.* ¶45.) The then current Kenyan GAC advisor – and only person with authority to make any decision – informed ICANN shortly afterwards that Kenya did not support Ms. Munyua's position. (*Id.*) ICANN ignored Kenya's official position. (*Id.*)

DCA informed ICANN that GAC committee members had conflicts of interest and if DCA's application was halted on the advice of the GAC, ZACR's application should suffer the same fate. (*Id.* ¶46.) ICANN accepted the GAC's advice, but continued to process ZACR's application. (*Id.*) This despite the fact that, nearly all of ZACR's endorsement letters do not actually reference ZACR, but instead support the AUC's request to reserve .Africa as a Top-Level Reserved Name. (*Id.* ¶48.) ICANN could have reconsidered its decision to accept the GAC's advice, but refused to do so. RJN, Ex. 1, p. 11 [Bylaws, Article IV, Section 2].

## F. <u>The Independent Review Process.</u>

The Guidebook provides that applicants may challenge ICANN's application processing through an Independent Review Process ("IRP"). (FAC ¶49.) The IRP is a binding arbitration, operated by the International Centre for Dispute Resolution, although ICANN has repeatedly denied the binding nature of its decisions. (*Id.*) Having been denied the fair, unbiased treatment it was entitled to, DCA sought review through the IRP. (*Id.* ¶51.) Despite the initiation of the IRP, ICANN again ignored its rules and regulations and entered into a registry contract with ZACR for the operation of .Africa. (*Id.* ¶53.)

The IRP concluded that ICANN failed to follow its Guidebook, Bylaws, and Articles of Incorporation in its processing of DCA's application. (*Id.* ¶54.) There was no finding that DCA's application was insufficient. (*Id.*) The IRP also held that its decision was binding and that ICANN should "continue to refrain from delegating the .Africa gTLD and permit DCA Trust's application to proceed through the

1  remainder of the new gTLD application process." (*Id.*)  It was the first IRP decision

2  regarding a new gTLD application where ICANN did not prevail.  (*Id.* ¶55.)

### G. ICANN's Processing of DCA's Application After the IRP Ruling.

4  After the unfavorable decision, ICANN took the position of re-evaluating

5  DCA's geographic endorsements – the endorsements that ICC recommended

6  ICANN accept and the endorsements that passed ZACR's application.  (*Id.* ¶58.)

7  After the IRP decision, ICANN issued DCA clarifying questions to explain DCA's

8  endorsements.  (*Id.* ¶59.)  ICANN could and should have issued the clarifying

9  questions during the initial processing if DCA's application, but did not. (*Id.* ¶60.)

10  DCA then agreed to an extended evaluation, but ICANN provided no further

11  explanation about the alleged deficiencies in DCA's application.  (*Id.*)

12  Accordingly, DCA has been denied the fair, transparent, unbiased treatment

13  ICANN promised and ICANN's motion to dismiss should be denied.

## III.  LEGAL STANDARD

15  A Rule 12(b)(6) motion tests the *legal sufficiency* of the claim or claims stated

16  in the complaint.  *Strom v. United States*, 641 F.3d 1051, 1067 (9th Cir. 2011).  "Rule

17  12(b)(6) motions are viewed with disfavor.  Dismissal without leave to amend is

18  proper only in 'extraordinary' cases.  When ruling on a 12(b)(6) motion, the

19  complaint must be construed in the light most favorable to the plaintiff.  The court

20  must accept as true all material allegations in the complaint, as well as any

21  reasonable inferences to be drawn from them."  *Broam v. Brogan*, 320 F.3d 1023,

22  1028 (9th Cir. 2003) [internal citations omitted].  "[A] well-pleaded complaint may

23  proceed even if it strikes a savvy judge that actual proof of those facts is improbable,

24  and 'that a recovery is very remote and unlikely.'"  *Bell Atl. Corp. v. Twombly,* 550

25  U.S. 544, 556 (2007).  In addition, "[t]he court may properly consider matters of the

26  public record (e.g. pleadings, orders and other court papers on file in another action

27  pending in the court, records and reports of administrative bodies; or the legislative

28  history of laws, rules or ordinances) … as long as the facts noticed are not subject to

1  reasonable dispute." *Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d
2  1048, 1052 (9th Cir. 2007).

**IV.   ARGUMENT**

    **A.   ICANN's Prospective Release is void.**

        The Prospective Release is void as a matter of law, because it's
unconscionable, and because it was fraudulently procured.  ICANN continues to rely
on the Prospective Release it claims insulates it from any judicial review[1] while
ignoring controlling law regarding Section 1668 and while ignoring the fact that this
Court has already ruled on DCA's motion for a temporary restraining order, thereby
demonstrating that the Prospective Release is not valid as a matter of law.

          1.   The Prospective Release violates California Civil Code §1668.

        The Prospective Release is void pursuant to California Civil Code Section
1668.  "All contracts which have for their object, directly or indirectly, to exempt
anyone from responsibility for his own fraud, or willful injury to the person or
property of another, or violation of law, whether willful or negligent, are against the
policy of the law."  Cal. Civ. Code §1668; *See also Reudy v. Clear Channel
Outdoors, Inc.,* 693 F.Supp.2d 1091, 1116 (N.D. Cal. 2007) ["a party [cannot]
contract away liability for his fraudulent or intentional acts or for his negligent
violations of statutory law,' regardless of whether the public interest is affected"
(internal citations and quotations omitted).]

        ICANN's Prospective Release encompasses every claim that arises from its
actions – necessarily including fraud and intentional violations of law: "Applicant

---

[1] ICANN concludes that Plaintiff's fraud and conspiracy to commit fraud claim arise
from the processing of Plaintiff's Application.  Plaintiff's fraud and conspiracy to
commit fraud claim alleges that ICANN improperly conspired with the AUC and
ZACR in processing **ZACR**'s application.  Therefore, the cause of action arises of
out ICANN's improper processing of ZACR's application and outside the scope of
the Prospective Release.

hereby releases ICANN and ICANN affiliated Parties…from any and all claims by applicant that arise out of, are based upon, or are in any way related to, any action, or failure to act, by ICANN…in connection with ICANN's review of this application, investigation or verification, any characterization or description of this application or the decision by ICANN to recommend, or not to recommend the approval of applicant's gTLD application."  RJN Exhibit 2, p. 445; *See also*, *Baker Pacific Corp v. Suttles*, 220 Cal.App.3d 1148, 1153 (1990) [holding a covenant not to sue that released "for, from and against any and all liability whatsoever" of "any and all claims of every nature" void for excluding fraud, intentional acts, and negligent violations of statutory law."]  Therefore, the Prospective Release is void, as a matter of law.

ICANN's reliance on *Commercial Connect v. Internet Corp. for Assigned Names and Numbers*, No. 3:16-cv-00012-JHM, 2016 U.S. Dist. LEXIS 8550 (W.D. Ky. Jan. 26, 2016), a district court decision from outside this circuit is entirely unpersuasive.  There, plaintiff's lawyers withdrew and plaintiff made no effective arguments to challenge the Prospective Release.  Plaintiff did not rely on California law and apparently never presented any of the arguments presented here – or any meaningful arguments at all.

ICANN's reliance on *Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92 (1963) is also inapposite because the Prospective Release waives fraud and intentional violations of law and under California law is therefore void regardless of whether it implicates public policy[2] *See Reudy v. Clear Channel Outdoors, Inc.*, 693 F.Supp.2d

---

[2] In any event, DCA satisfies the test under *Tunkl* invalidating the Prospective Release.  *See Tunkl*, *supra* at 98-101 (listing factors).  First, ICANN's business is suitable for public regulation and was regulated by the U.S. government (Motion, p. 1: 2-4). ["ICANN is **tasked** with coordinating portions of the Internet's domain name system"]; p. 2:5-7 ["Pursuant to a series of agreements over the years with the United States Department of Commerce"].).  Second, ICANN's fair regulation of the Internet is of great importance and practical necessity. RJN, Ex. 1, pp. 5-6

1    1091, 1116 (N.D. Cal. 2007) [referencing Cal. Civ. Code §1668]. *See also Health*

2    *Net of California v. Department of Health Services*, 113 Cal.App.4th 224, 235-239

3    (2003). **This is the law**, and ICANN fails to explain how its release can overcome

4    it.[3]

5                       2.   The IRP does not validate the Prospective Release.

6         The IRP forum does not save the Prospective Release as ICANN refuses to

7    recognize the process as binding.  As the IRP Panel explained, "The Panel seriously

8    doubts that the Senators questioning former ICANN President Stuart Lynn in 2002

9    would have been satisfied had they understood that a) ICANN had imposed on all

10   applicants a waiver of all judicial remedies, *and* b) the IRP process touted by ICANN

11   as the 'ultimate guarantor' of ICANN accountability was only an advisory process,

12   the benefit of which accrued only to ICANN." FAC Ex. 1, p. 13.  More importantly,

13   even if ICANN had voluntarily accepted the ruling, a dispute resolution procedure

14   ICANN is free to disregard is hardly effective and certainly does not provide

15   _____

16   [Bylaws, Article I, Section 1.)*)*. ["ICANN's mission is to coordinate...the global

17   Internet's system of unique identifiers, and in particular to ensure the stable and

18   secure operation of the Internet's unique identifier status" (internal quotations

     omitted)].  Third, DCA's services are broadly offered as anyone can apply for

19   gTLDs, and gTLDs allow all Internet users to access websites.  Fourth, ICANN is

20   the *only* entity that can grant the rights to gTLDs and holds all of the bargaining

21   power.  Fifth, DCA had no choice but to accept the release in order to apply for the

     gTLD.  Finally, ICANN controls applicant's property in the form of the $185,000

22   gTLD application fee.  ICANN can unilaterally deny an application without refund

     or redress.

23   [3] *City of Santa Barbara v. Sup. Court,* is inapposite because it involved "an

24   agreement purporting to release liability for future gross negligence committed

25   against a developmentally disable child who participates in a recreational camp

     designed for needs of such children," which the court found violated public policy.

26   (41 Cal.4th 747, 777 (2007)).   *Sanchez v. Bally's Total Fitness Corp*, [68

27   Cal.App.4th 62 (1998)] is inapposite because the waiver excepted "claims arising

     out of the center's knowingly failing to correct a dangerous situation brought to its

28   attention."  [Id., at 65].  *Sanchez* does not discuss Section 1668.  Here, the release

     waives all liability, not just negligence.

OPPOSITION TO ICANN'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  applicants with an effective method of redress.[4]

2      ICANN fails to explain why the holding in *Skrbina v. Fleming Cos.,* 45

3  Cal.App.4th 1353, 1366 (1996) dealing with a release in a settlement agreement

4  should apply here.[5]  As the court in *Reudy* explained "the Special Master finds ***that***

5  ***when two parties settle a case and a consideration is given in which a plaintiff***

6  ***allows a defendant to continue on with its' alleged wrongful conduct, that conduct***

7  ***is no longer wrongful***, at least as to that particular defendant.  Plaintiff in exchange

8  for consideration is permitting that conduct to go forward in the future." *Id.*, at 1119

9  (emphasis added).  There was no settlement here and no wrongful conduct ongoing

10 when Plaintiff submitted its application.  A settlement release is not analogous to the

11 *Prospective* Release; if it were, it would obviate the need for Section 1668.

12              3.  <u>The release is void regardless of DCA's claims.</u>

13     Because the release is void, the Court should sever it from the Guidebook,

14 decline to apply it to any of DCA's claims, and adjudicate DCA's claims against

15 ICANN.  Cal. Civ. Code §1599; *Ulene v. Jacobson*, 209 Cal.App.2d 139, 142-143

16 (1962) ["To the extent that the challenged provisions are in violation of the

17 governing statutory law, they are void."]  ICANN argues that if the provision is

18 unenforceable, it is only unenforceable as to DCA's claims sounding in fraud.

19 [Motion, n.5]  There is no authority for this proposition; a severed provision is not

20 severed solely to a cause of action, but is severed entirely.  Because the Prospective

21 Release violates the law, it is void and DCA can proceed in this Court.

22

23
_____

24 [4] The scope of the IRP is limited to review of actions "inconsistent with the Articles
of Incorporation or Bylaws." (FAC Ex. 1, p. 25).  Therefore, even under the Bylaws
25 ICANN is free to engage in wrongful conduct without repercussion to the extent that
it does not violate its own Articles and Bylaws.
26 [5] ICANN's cite to *Paralift, Inc. v. Superior Court*, 23 Cal.App.4th 748 (1993) is
27 again inapposite.  A release for negligence against a Sky-Diving company, where
the risks of skydiving were known to the Plaintiff who skydived on multiple previous
28 occasions is not comparable to the Prospective release of *all* claims.

1

2

### 4. <u>The release is unconscionable as DCA could not negotiate it and it only prohibits DCA from bringing claims in a court of law.</u>

3

The Prospective Release is unconscionable because DCA did not have a meaningful opportunity to negotiate it. ICANN itself submitted criticism of the Prospective Release from its own advisory group, the GAC. *See* Request for Judicial Notice, Ex. 3 ("The exclusion of ICANN liability …provides no leverage to applicants to challenge ICANN's determinations …**The covenant not to challenge and waiver … is overly broad, unreasonable, and should be revised in its entirety**") (emphasis added)]. The GAC is composed of governments and distinct economies, and "consider[s] and provide[s] advice on the activities of ICANN …particularly matters where there may be an interaction between ICANN policies and various laws...or where they may affect public policy issues." (*Id.*). **ICANN refused to eliminate the Prospective Release in the face of the GAC and other commenters' recommendations.** It is therefore disingenuous to imply DCA could have effectively negotiated elimination of the release or used the comment process to avoid it.

Furthermore, ICANN ignores the fact that the Prospective Release *only bars applicants from proceeding against ICANN* in a court of law; the Prospective Release allows ICANN to sue its applicants by any means available. "Substantive unconscionability focuses on the one-sidedness of the contract terms." *Ting v. AT&T*, 319 F.3d 1126, 1149 (9th Cir. 2003). "It is quite true that an agreement for alternative dispute resolution which is not binding on the party insisting on it may be deemed unfair; there must be a 'modicum of bilaterality'". *Woodside Homes of Cal. v. Sup. Court*, 107 Cal.App.4th 723, 731 (2003) [citing *Armendariz v. Foundation Health Pyschcare Services, Inc.*, 24 Cal.4th 83, 117-118 (2000) ("[U]consciability turns not only on a 'one-sided' result, but also on an absence for 'justification' for it.")].

28

---

1       ICANN cannot justify its entirely one-sided release of all dispute resolution

2   forced upon DCA and all other gTLD applicants.  ICANN is not prohibited from

3   suing gTLD applicants in a court of law, but attempts to unilaterally assert that is not

4   liable for any actions, regardless of the unlawful nature or egregiousness thereof.

5   *See* Motion, p.3:8-25. ["**Applicant** hereby releases ICANN and the ICANN

6   Affiliated Parties"; "**APPLICANT** AGREES NOT TO CHALLENGE, IN A

7   COURT OF LAW" (bold emphasis added)].  If a member of the public seeks a gTLD

8   (which is only available through ICANN), by the application it is forced to accept

9   the Prospective Release.  There is no bilateral application and there is no bargaining.

10  The Prospective Release is unconscionable and must be struck.

11      ICANN again mischaracterizes its responsibility and duty to act fairly, even

12  handedly, and with transparency in processing gTLD applications.   ICANN

13  concludes that "Plaintiff was aware of the other risks involved in applying for

14  .Africa" ignoring its preferential treatment of ZACR of which DCA could not have

15  contemplated or imagined when it submitted its application and $185,000 fee.

16  ICANN further argues "**If Plaintiff did not like the terms of any portion of the**

17  **Guidebook**, including the Covenant Not to Sue and the governmental support

18  requirement, **Plaintiff did not have to apply for a gTLD**" and "**Plaintiff has no**

19  **basis** now **to repudiate its entirely voluntary decision** to submit its Application or

20  to argue that portions of the Guidebook (the contract that forms the basis for most of

21  its claims) should not apply to Plaintiff (and only Plaintiff) (Motion at p. 12: 23-26).

22  ICANN's own argument demonstrates its "take-it-or-leave it", no bargaining power

23  or compromise, position.  DCA has no other means to obtain the .Africa gTLD.

24  DCA is not attempting to repudiate its application and the Guidebook, but rather

25  enforce its terms against ICANN; DCA was unaware of ICANN's improper actions

26  at the time of submitting the Application and that is the very basis of DCA's claims.

27  DCA makes no argument that the Prospective Release is void only to it, rather DCA

28  has argued repetitively that the Prospective Release is void as a matter of law.

In any event, discovery may reveal important factual support regarding public and internal comments on the Prospective Release, ICANN's consideration of those comments, and their rationale for including the Prospective Release in the Guidebook.  At the very least, the unconscionable nature of the Prospective Release is a factual issue and not appropriate for determination on a Rule 12(b)(6) motion.

Finally, the sophistication of a party is not dispositive to a determination of unconscionability.  "[T]he sophistication of a party alone, cannot defeat the procedural unconscionability claim."  *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1283 (9th Cir. 2006).

### 5.   The Prospective Release was procured by fraud.

ICANN asserts "the only 'fraud' that Plaintiff identifies is that 'ICANN denies in practice that the IRP is binding."  (Motion at p. 13: 23-24.)  Ignoring Plaintiff's allegations that:

> "a. ICANN represented to Plaintiff that Plaintiff's application for .Africa would be reviewed in accordance with, ICANN's Articles of Incorporation, and the new gTLD Applicant Guidebook; all of which promise a fair and transparent bid process, fair competition, and non-interference with an applicant's application by a competitor or third-party;
>
> b. ICANN represented that it had in place an Accountability Mechanism including an Independent Review Panel (IRP) process to ensure that Plaintiff would be provided proper due process in the event of a dispute regarding any decision by ICANN regarding Plaintiff's application under the new gTLD Program;
>
> c. ICANN represented that it would participate in good-faith with any applicant who desired to initiate an IRP process in order to ensure that applicants receive proper due process; and
>
> d. ICANN represented that all applicants for the .Africa gTLD would be subject to the same agreement, rules, and procedures." (FAC ¶74.)

In addition to those allegations, DCA pleaded fraud against ICANN for conspiring with the AUC (through its proxy ZACR) to deny DCA's .Africa application. (*Id.* ¶¶84-86.)

Moreover, the IRP Final Declaration illustrated in depth, how ICANN's Bylaws, Supplementary Procedures, and testimony to the U.S. Senate gave the impression that the IRP procedure was binding and provided due process to applicants. (*Id.*, Ex. 1 at 41-42). ICANN's current position that the IRP is not binding shows that ICANN made a material representation to applicants, including DCA. Discovery regarding ICANN's statements about the IRP to Congress or other governmental bodies as well as internal discussion regarding the role and function of the IRP could support DCA's fraud claims.

Plaintiff has pled multiple misrepresentations by ICANN, both explicit and by omission. These allegations are sufficiently particular and support the argument that ICANN's Prospective Release was procured by fraudulent means.

**B. ICANN's discretion in reviewing applications is not a bar to DCA's breach of contract claim**

ICANN argues that the discretion to "determine not to proceed with any and all applications for new gTLDs" means that it cannot have breached the Guidebook. However, DCA alleges that ICANN failed to comply with other provisions in the Guidebook regarding: 1) gTLD program rules of transparency and fair competition; 2) the geographic names evaluation process; and 3) GAC procedures (*Id.* ¶¶ 68-71). ICANN cannot accept an $185,000 application fee and then refuse to abide by the provisions of the Guidebook and the rules that ICANN incorporated therein.

The interpretation of ICANN's "discretion" clause is ambiguous. It cannot mean that ICANN can decide to reject a qualified applicant for any reason whatsoever. It must be read in context and in conjunction with the numerous other provisions in the Guidebook which limit and define that discretion. Cal. Civ. Code §1641. The Guidebook establishes certain requirements and standards by which it

will judge applications, and it would be superfluous to have those provisions if ICANN could arbitrarily accept or deny an application. *See generally* RJN Ex. 2, pp. 134 [Section 1.2.1 (Eligibility)]; p.138 [Section 1.2.2 (Required Documents)]; and p.155 [Section 1.5 (Fees and Payments)]. Of course ICANN may use its discretion in rejecting gTLD applications – but it must still apply the rules that it agreed to in the Guidebook in exercising that discretion.

In this case, any ambiguities in the Guidebook should be interpreted in DCA's favor because ICANN drafted the Guidebook. Cal. Civ. Code §1654; *See Oceanside 84, Ltd. V. Fidelity Federal Bank*, 56 Cal.App.4th 1441, 1448-1449 (1997) ["If a contract is capable of two different reasonable interpretations, the contract is ambiguous. A well-settled maxim states the general rule that ambiguities in a form contract are resolved against the drafter."]; *See Garcia v. Stonehenge, Ltd.*, No. C-97-4368-VRW, 1998 U.S. Dist. LEXIS 23565, at *6 (N.D. Cal. Mar. 2, 1998) ["[F]ederal courts may apply general principles of state law regarding contract interpretation."]. Furthermore, because of the ambiguity parole evidence will be admissible and therefore discoverable. *Chastain v. Belmont*, 43 Cal.2d 45, 51 (1954).

ICANN relies heavily on *Image Online Design, Inc. v. Internet Corporation for Assigned Names and Numbers*, No. CV 12-08968-DDP (JCx), 2013 U.S. Dist. LEXIS 16896 (C.D. Cal. Feb. 7, 2013), in which the plaintiff alleges breaches of its agreement with ICANN related to ancillary documents and statements outside of the TLD application. But, in that case, plaintiff relied upon statements not in the Guidebook or Bylaws for its breach of contract claim, and Judge Pregerson made the unremarkable ruling that such statements were not part of any contract between the parties. *See id.* at *9-10 ["IOD does not specifically claim that the statements in the Reconsideration Recommendation or made by the Chairman, discussed above, were part of the Agreement. […] IOD provides no reason why statements beyond the Agreement, made after the contract was entered into, should be considered to be

part of the contract."]   Judge Pregerson also stated: "These provisions [of the Guidebook] give ICANN no responsibilities with respect to IOD's Application beyond its initial consideration of the Application." *Id.* *11.  This case is inapposite because, in stark contrast, DCA alleges ICANN breached specific provisions of the Guidebook and Bylaws, both contractual provisions agreed to by the parties, not outside documents.  RJN Ex. 1, p. 6-7 [Bylaws Articles I, Section 2, ¶¶5-8]; p.8 [Bylaws Article II, Section 3]; p. 8 [Bylaws Article III]; Ex. 2, p.113 [Guidebook Preamble]; p.118 [Section 1.1.2.3]; FAC Ex. 1 at p.36, ¶30 ("According to ICANN, panelists derived their powers...from...the contractual provisions agreed to by the Parties (in this instance ICANN's Bylaws").

ICANN concludes that it "complied with its obligations to consider Plaintiff's Application in accordance with the procedures set forth in the Guidebook[.]" Motion at 16:13-16.  ICANN did not comply with its obligations; the entirety of DCA's complaint is based on ICANN's failure to follow the Guidebook, Articles of Incorporation, or Bylaws. *See* FAC ¶¶29, 40, 46, 54, 68, 69, and 70.  The IRP Panel already determined this fact. *Id.* Ex. 1, p. 67, ¶93.  But in any event, because "the court must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them" ICANN's conclusion regarding its compliance with the Guidebook is irrelevant on the motion to dismiss. *Broam v. Brogan*, *supra* 320 F.3d 1023, 1028.

Accordingly, ICANN's self-described "discretion" does not somehow trump all of the other Guidebook requirements and does not grant it absolute immunity or protection from breaches of the agreement between the Parties.

## C. <u>DCA has pleaded fraud with specificity.</u>

DCA has presented facts sufficient to apprise ICANN of its alleged fraud. "The purpose of Rule 9(b) is to assure that defendants are apprised of the allegations against them in sufficient detail to frame an adequate responsive pleading." *Prakash v. Pulsent Corp. Emple. Long Term Disability Plan*, No. C-06-7592 SC, 2008 U.S.

Dist. LEXIS 120366, at *5 (N.D. Cal. August 20, 2008).  As stated above, ICANN falsely represented through its website and Guidebook, that:

- Plaintiff's .Africa application would be reviewed in accordance with ICANN's Articles of Incorporation and Guidebook, in a fair and transparent bid process, with fair competition, and non-interference by a competitor or third-party (RJN Ex. 1, p. 6-7 [Bylaws Articles I, Section 2, ¶¶5-8]; p.8 [Bylaws Article II, Section 3]; p. 8 [Bylaws Article III]; Ex. 2, p.113 [Guidebook Preamble]; p.118 [Section 1.1.2.3];

- ICANN had an accountability mechanism process to ensure that DCA would be provided proper due process in the event of a dispute (RJN Ex. 1, p.11 [Bylaws, Article IV];

- ICANN would participate in good-faith with any applicant who desired to initiate an IRP process in order to ensure that applicants received proper due process [*Id.*]; and

- All applicants would be subject to the same agreement, rules, and procedures (RJN Ex. 1, p. 8 [Bylaws, Article I, Section 3] (FAC ¶74).

In addition to those allegations, DCA also alleged the following fraud by ICANN and ZACR:

- ICANN conspired with AUC and ZACR to assist each other in improperly denying DCA's application; and

- ICANN improperly accepted ZACR's fraudulent application to proceed in contradiction of its Guidebook, Articles of Incorporation, and Bylaws. (FAC ¶¶84-88.)

These representations are in the applicable Guidebook and controlling documents between the parties. Accordingly, the who, what, when, and where of the fraud, and the Rule 9(b) requirements are all met. *See Pedersen v. Greenpoint Mortg. Funding, Inc.*, No. 2:11-cv-00642-KJM-EFB, 2013 U.S. Dist. LEXIS 109111, at *

21 (E.D. Cal. Aug. 1, 2013) [holding the contents of documents were representations sufficient to support a cause of action for fraud]. These allegations inform ICANN of the extent of its alleged fraudulent conduct and apprise ICANN with sufficient detail to frame an adequate responsive pleading.[6]

### D. **At the very least, leave to amend should be granted.**

In the event that the Court finds any of DCA's allegations insufficient, DCA can amend its claims with particular facts. "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "It is black-letter law that a district court must give plaintiffs at least one chance to amend if their complaint was held insufficient." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 9th Cir. 2015). ICANN makes no showing that amendment by DCA is futile in the event that the Prospective Release does not apply. DCA respectfully requests leave to amend if the Court finds any of its allegations insufficient.[7]

## V.   **CONCLUSION**

For the foregoing reasons, DCA requests that this Court deny ICANN's Motion to Dismiss or, at a minimum, grant DCA leave to amend any deficiencies.


Dated: April 4, 2016                         **BROWN NERI & SMITH LLP**

                                             By:   /s/ Ethan J. Brown
                                                   Ethan J. Brown

                                             *Attorneys for Plaintiff*
                                             DOTCONNECTAFRICA TRUST

---

[6] DCA expects that discovery will reveal that ICANN was assisting AUC from the outset and never intended to fulfill any of its obligations to DCA.

[7] DCA can also add a cause of action for promissory estoppel on leave to amend.

## CERTIFICATE OF SERVICE

I, Ethan J. Brown, hereby declare under penalty of perjury as follows:

I am a partner at the law firm of Brown, Neri & Smith LLP, with offices at 11766 Wilshire Blvd., Los Angeles, California 90025.  On April 4, 2016, I caused the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS' MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** to be electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on April 4, 2016

 /s/ Ethan J. Brown